1  KENNETH R. WILLIAMS, State Bar No. 73170
   Attorney at Law
2  980 9th Street, 16th Floor
   Sacramento, CA 95814
3  Telephone:  (916) 543-2918

4  PATRICK D. WEBB
   WEBB & CARREY
5  402 West Broadway. Ste 680
   San Diego CA 92101
6  Telephone:  (619) 236-1650

7  *Attorneys for Plaintiffs*
   *Jamul Action Committee and*
8  *The Jamul Community Church*

9                    IN THE UNITED STATES DISTRICT COURT

10              FOR THE EASTERN DISTRICT OF CALIFORNIA

11

12

13  **JAMUL ACTION COMMITTEE and the**          Case No.
    **JAMUL COMMUNITY CHURCH,**

14                            Plaintiffs,        **COMPLAINT FOR  DECLARATORY**
                                                 **AND INJUNCTIVE RELIEF**
              v.
15

16  **TRACIE STEVENS, Chairwoman of the**
    **National Indian Gaming Commission,**
17  **SALLY JEWELL, Secretary of the U.S.**
    **Department of the Interior, KEVIN**
18  **WASHBURN, Assistant Secretary – Indian**
    **Affairs, U.S. Department of the Interior,**
19  **PAULA L. HART, Director of the Office of**
    **Indian Gaming, Bureau of Indian Affairs,**
    **AMY DUTSCHKE, Regional Director,**
20  **Bureau of Indian Affairs, , JOHN RYDZIK,**
    **Chief, Division of Environmental,  Cultural**
21  **Resources Management and Safety of the**
    **Bureau of Indian Affairs, and U.S.**
22  **DEPARTMENT OF THE INTERIOR, and**
    **NATIONAL INDIAN GAMING**
23  **COMMISSION,**

24                            Defendants.

25

26          Plaintiffs, the Jamul Action Committee and the Jamul Community Church, file this

27  Complaint for Declaratory and Injunctive Relief against Defendants, and each of them, and allege

28  as follows:

                                        1

## **NATURE OF THE ACTION**

1.  The Plaintiffs challenge the National Indian Gaming Commission's ("NIGC") final agency action that declared that the Jamul Indian Village ("JIV") has "Indian lands" that qualify for gambling under the Indian Gaming Regulatory Act ("IGRA"). (25 U.S.C. § 2703.)  This Indian lands determination ("ILD") was first included in the "PUBLIC NOTICE: Notice of Intent to Prepare a Supplemental Environmental Impact Statement (SEIS; attached hereto as Exhibit J) for the Approval of a Gaming Management Contract.  The ILD was issued by the Chairwoman of the NIGC and supported by the Secretary of the U.S. Department of the Interior ("DOI") through their employees, designees and agencies, including the Bureau of Indian Affairs ("BIA").  The ILD was first published in the Federal Register, on April 10, 2013.  (78 Fed.Reg. 21398-21399.)

2.  The ILD  is a final agency action which was included in the SEIS to permit the NIGC to approve the Management Contract for the operation of a 203,000 square foot mega-casino on a 4.66 acre parcel of land, now known by the County of San Diego tax assessor's parcel number, APN 597-080-04 ("the Parcel").  The Parcel is not a reservation and does not qualify as Indian lands eligible for gambling under IGRA, 25 U.S.C. 2703, for several reasons.

3.  The Defendants lack the authority under the Indian Reorganization Act ("IRA"; 25 U.S.C. §§ 465 et. seq.)  to take the Parcel in trust for the JIV or to treat it like a reservation for JIV.  The IRA authorizes the Secretary of Interior to take land in trust for "any recognized Indian tribe now under Federal jurisdiction." 25 U.S.C. § 479  The Supreme Court made clear that this phrase refers only to federally recognized tribes that were  in existence when the IRA was enacted in 1934. *Carcieri v. Salazar,* 555 U.S. 379 (2009).  The JIV was not "recognized under federal jurisdiction," when the IRA was enacted on June 18, 1934.  The Defendants' conclusion in the ILD that the JIV has a reservation that qualifies as Indian lands pursuant to

2

25 U.SC. section 2703 was an abuse of discretion and is arbitrary, capricious and contrary to the law.  It should be vacated by this Court.

4. The Parcel is not a reservation as that term is used in federal law.  It was never taken into trust for the JIV, and the JIV has never exercised governmental power over the Parcel, as defined by IGRA, 25 U.S.C. 2703.  As confirmed in several recent Supreme Court decisions, including *Carcieri v. Salazar* and *Hawaii v. Office of Hawaiian Affairs,* 129 S Ct. 1436 (2009) and *City of Sherrill v. Oneida Indian Nation*, 544 U. S. 197 (2005), the Defendants have no authority to create a reservation or Indian lands on non-public domain lands within the exterior boundaries of the State of California. The Parcel is not public domain land and is subject to State jurisdiction.  The State has not ceded jurisdiction to the JIV or the United States.  The Defendants' attempt to exempt and remove the Parcel from State jurisdiction by characterizing it as a reservation or Indian lands eligible for gambling in the ILD is an abuse of discretion and is arbitrary, capricious and contrary to the law.  It should be vacated by this Court.

5.    The ILD is intended to facilitate the construction of a major gambling casino and related facilities on the Parcel.  But the Parcel is not eligible for Indian gaming.  IGRA prohibits Indian gaming on land acquired after 1988 unless one of the statute's narrow exceptions applies. (29 U.S.C. §§ 2701-2721.)  The IGRA exceptions do not apply to the Parcel.  The Defendants' determination in the ILD that the Parcel is a reservation, or Indian lands eligible for gaming under IGRA, is not supported by the record.  It was an abuse of discretion and is arbitrary, capricious and contrary to the law.  It should be vacated by this Court.

6. The Defendants failed to comply with National Environmental Policy Act (NEPA; 42 U.S.C. § 4321 et seq) before they approved and implemented the ILD.  The ILD  is contrary to law and its implementation would cause permanent and irreparable harm to the environment.  The

3

Defendants failed to apply a fair and unbiased analysis of the jurisdictional and human impacts caused by the ILD, or take a "hard look" at the environmental impacts, as required by NEPA. The Defendants failed to even prepare an Environmental Assessment before considering the ILD as required by NEPA.  Moreover, Defendants failed to consider that the resulting casino, whose location was chosen for its proximity to the same gaming markets served by the Sycuan, Viejas and Campo casinos, will dramatically impair their ability to support their members, and their future cultural integrity as  tribes.  JAC therefore seeks declaratory and injunctive relief from the Secretary's order.  The Defendants failure to comply with NEPA was an abuse of discretion and is arbitrary, capricious and contrary to the law.  Thus the ILD should be vacated by this Court at least until there is full compliance with NEPA by the Defendants, including the preparation and circulation of an Environmental Impact Statement.

7. The ILD is a final agency action that is unauthorized under the IRA and it violates IGRA. Also the ILD fails in multiple respects to comply with the requirements of NEPA.  Plaintiffs seek declaratory and injunctive relief against the Defendants to preclude the implementation of the ILD.  Plaintiffs request that the Court review and vacate NIGC's approval of the ILD on the basis that it is arbitrary and capricious and contrary to law. Accordingly, the ILD is unlawful and it should be set aside, as provided for under 5 U.S.C. § 706.

**JURISDICTION AND VENUE**

8  The jurisdiction of this Court is invoked pursuant to 28 U.S.C. §§1331 et. seq, 5 U.S.C. §§ 701-706, and 28 U.S.C. §§ 2201-2202.  The United States has waived sovereign immunity from suit under 5 U.S.C. §702 and 28 U.S.C. §2209(a).  This Court may issue declaratory relief and reverse, delay, or postpone Defendants' actions or otherwise issue an injunction against the ILD  under 28 U.S.C. §§ 2201-2202 and 5 U.S.C. §§ 702-705.  There is an actual

4

controversy between the parties that is subject to the jurisdiction of this Court regarding decisions and actions by Defendants with respect to the ILD. All applicable federal administrative remedies have been exhausted as required by 5 U.S.C. §704. This action arises under federal law, including the Indian Reorganization Act, 25 U.S.C. §§ 465 *et. seq,* the Indian Gaming Regulatory Act, 25 U.S.C. §§ 2700 *et seq*, the National Environmental Policy Act, 42 U.S.C. §§ 4321 *et seq* and the Tenth Amendment of the United States Constitution.

9    Venue is proper in United States District Court for the Eastern District of California under 28 U.S.C. §§ 1391(b) and (e), 5 U.S.C. § 703.  Venue is proper in this judicial district because at least one defendant resides or has a business office in this judicial district, and because a substantial portion of the events regarding the ILD giving rise to the Plaintiffs' claims occurred in this district.

**10**  The ILD is a final agency action that is reviewable by this Court. 5 U.S.C. §§ 700 et/seq.; *Match-E-Be-Nash-She-Wish Band of Pottawatomi Indians v. Patchak*, 132 S. Ct. 2199 (2012); *Wells Fargo Bank v. Lake of the Torches Economic Development Corporation* (7th Cir. 2011) 658 F.3d 684, 688, 699.  The Defendants approval of the ILD was arbitrary and capricious and is contrary to law.  The ILD is not supported by any evidence in the record and should be vacated by this Court.

## **PARTIES**

**11.** Plaintiff, JAMUL ACTION COMMITTEE ("JAC") is a non-profit organization of citizens living in and around the rural unincorporated town of Jamul, California.  The JAC and its members are dedicated to preserving the small-town rural lifestyle of its community.  JAC has actively monitored JIV's proposed development of a major casino in Jamul.  JAC's members own homes and operate businesses in the rural unincorporated town of Jamul that would be adversely impacted if the ILD is implemented and a major gambling casino is built on the

Parcel.  Specifically, the JAC and its members will personally suffer environmental, aesthetic, and economic harm by, among other things: (a) community water wells suffering from groundwater depletion, (b) adverse air pollution impacts, (c) traffic congestion, (d) significant adverse impacts on the environment, (e) diminished property values, and (f) increased risk of criminal violence.  The JAC and its members will personally suffer injury as a result of the increased risk of gambling, alcohol, and other personal addictions in the community, the added financial strain on local governments by increasing the demand for social and law enforcement services, and job losses to existing Jamul businesses.

**12.**   JAC members include, but are not limited to the following persons:  Gary L. Classen, Kymm Salmonsen, Andrew Salmonsen, Michael Stalnaker, Glen Revell, Randy White, Lisa Darroch,, Donald Beers, Roberto Salazar, Darla Kasmedo, Marcia Spurgeon, Michael Spurgeon, William Hendrix, Donna Hendrix, Peter Shenas, Celeste Shenas, J. Randy Terry, Patty Terry, Gene Luise Merlino, and Paul Scripps who all reside in the unincorporated rural town known as Jamul. California. As stated in the preceding Paragraph 11, all of these individuals will be adversely impacted if the Defendants' ILD and determination that the Parcel is a reservation or Indian lands eligible for gambling operations under IGRA and a casino is constructed and gambling is allowed on the Parcel as described in the SEIS.

**13.**   The JAMUL COMMUNITY CHURCH ("JCC") is a community based Christian Church located in the unincorporated rural town of Jamul.  The JCC and its community will be adversely impacted if the NIGC's determination that the Parcel is Indian lands eligible for gambling operations under IGRA and a casino is constructed and gambling is allowed on the Parcel as described in the SEIS.  Specifically, the JCC and its members will personally suffer environmental, aesthetic, and economic harm by, among other things: (a) community water wells suffering from groundwater depletion, (b) adverse air pollution impacts, (c) traffic

congestion, (d) significant adverse impacts on the environment, including protected species, and their habitat, (e) diminished property values, and (f) increased risk of criminal violence. The JCC and its members will personally suffer injury as a result of the increased risk of gambling, alcohol, and other personal addictions in the community, the added financial strain on local governments by increasing the demand for social and law enforcement services, and job losses to existing Jamul businesses.

**14.** The individual Defendants are all employees or appointees of the Federal government and include:

    a.   TRACIE STEVENS, Chairwoman of the National Indian Gaming Commission,

    b.   SALLY JEWELL, Secretary of the U.S. Department of the Interior,

    c.   KEVIN WASHBURN, Assistant Secretary – Indian Affairs, U.S. DOI,

    d.   PAULA L. HART, Director of the Office of Indian Gaming, Bureau of Indian Affairs,

    e.   AMY DUTSCHKE, Regional Director, Bureau of Indian Affairs,

    f.   JOHN RYDZIK, Chief, Division of Environmental, Cultural Resources Management and Safety of the Bureau of Indian Affairs.

All of the individual Defendants are being sued in their official capacity and are named defendants as a result of the actions and decisions for which they bear the responsibility.

**15.** Defendant, DEPARTMENT OF INTERIOR, is a cabinet level agency of the United States and is the agency responsible for managing the affairs of Indian tribes primarily through the BIA. The DOI is responsible for insuring compliance with its laws and regulations.

**16.** Defendant, NATIONAL INDIAN GAMING COMMISSION, is a separate agency of the United States and is responsible for making Indian lands determinations under IGRA. The NIGC is responsible for insuring compliance with its laws and regulations

7

## BACKGROUND

**17.** California was a part of the Republic of Mexico between 1823 and 1846.  One of the charter documents of the Mexican Republic was the Plan of Iguala which was enacted on February 4, 1821.  This remarkable document included the following emancipation:

> "All the inhabitants of New Spain, without distinction, <u>whether Europeans, Africans or Indians</u>, are citizens of the monarchy, with the right to be employed in any post, according to their merits and virtues." (Emphasis added.)

**18.** Thus all Indians under the jurisdiction of Mexico, including any Indians living in or around Jamul, became full citizens of the Republic of Mexico in 1821.  In addition, in 1833 the Spanish Missions were secularized by the Mexican Republic and the lands surrounding the Missions were conveyed to the resident Indians – sometimes called neophytes.  In summary, in the Mexican Republic, all Indians were citizens of Mexico (not members of a separate tribe) who had the right to own land and, subject to a property qualification, could vote.

**19.** The territory that was to become California, including any public domain lands, was ceded to the United States by Mexico in 1848 pursuant to the Treaty of Guadalupe Hidalgo.   (9 Stats. 922 (1848.)  The treaty  provided for the protection of public and private property rights.  Specifically property rights "of every kind," (including Indian property rights) that were respected under Mexican law was also to be respected by the United States.  (*Id.*)

**20.** On September 9, 1850, California was admitted to the Union.  (9 Stats.  452 (1850).)  Between 1846 and 1850, California was governed by several United States Military Governors. California entered the Union on an "equal footing" with, and with the same public property rights, jurisdiction and regulatory authority, as all other States.

**21.**  In 1851, Congress passed an Act which established a comprehensive claims procedure to provide for the orderly settlement of Mexican land claims.  (Act of Mar. 3, 1851, sec. 8, ch. 41, 9 Stat. 632.)  If a property claim was not filed within the 5 year allowed timeline, then it

8

would be barred and the property moved to public domain for subsequent conveyance to the State or private owners.  This claims procedure applied to all property claims, including ancestral or aboriginal claims by Indians.  *Summa Corporation v. California ex rel. State Lands Commission* 467 U.S. 1231 (1984).  A timely claim was not filed by or on behalf of any Indian in Jamul.  Therefore aboriginal or ancestral claims, if any, of the Indians living in or around Jamul were relinquished and cannot now be revived by the Defendants in the ILD.

**22.** In 1864, Congress passed an Act which specifically stated that no more than four reservations could be established within the State of California.  (13 Stat. 39.)  This Act became known as the Four Reservations Act.  The unambiguous purpose of the Four Reservations Act was to "provide for better organization of Indian Affairs in California." (*Id.*)  The four reservations were Round Valley, Hoopa Valley, Tule River and "Mission."  *Mattz v. Arnett* (1973) 412 U.S. 481, 489-491.

**23.** In 1887, Congress passed the General Allotment Act.  (24 Stat. 388.)  This Act authorized the President to allot and transfer portions of reservation lands to individual Indians.  It also allowed the Secretary to negotiate with the tribe for the sale of "excess" lands, remaining after the allotments, for purpose of non-Indian purchase and settlement. The Jamul Indians did not own or occupy reservation land that was subject to the General Allotment Act.

**24.** In 1891, Congress provided for the creation of a limited number of additional reservations in California for "Mission" Indians in the Mission Indian Relief Act (MIRA).  (Act of Jan 12, 1891, 26 Stat. 212.)  The MIRA is an exception to the reservation limit established by the Four Reservations Act created for the Mission Indians in Southern California.  (See *St. Marie v. United States* (9th Cir, 1940) 108 F.2d 876.)

**25.** In 1907 Congress supplemented MIRA and created additional reservation land for Southern California Mission Indians.  (34 Stat. 1022-1025, c.2285.)

9

**26.** In 1924, Congress conferred citizenship on all Indians born in the United States including the Indians of San Diego County.  (8 U.S.C. § 1401(b).)  And, by reason of the 14th amendment, the grant of federal citizenship had the additional effect of making Indians citizens of the states where they resided.   State citizenship bestows rights and corresponding duties which one is not free to selectively adopt or reject.  Included with a citizen's rights and duties is the obligation to comply with State and local laws and regulations and pay appropriate taxes for the support of State and local governments.  The Defendants attempt to use the ILD to insulate some California citizens in the JIV from State and local laws, regulations and taxation is unconstitutional and a violation of equal protection.

**27.** In 1928, Congress passed the Jurisdictional Act which allowed the Indians of California to sue the United States, on an equitable basis only, for the loss of their aboriginal and other property claims in California. (45 Stats. 605.)  The Indians of San Diego County filed affidavits to participate in the anticipated California Indian Judgment Fund.  The case settled in 1944 for over 17 million dollars.  The settlement was divided and distributed to the surviving claimants including the Mission Indians.

**28.** In 1934, Congress enacted the IRA.  (25 U.S.C. §§ 461 et seq.)  A purpose of the IRA was to reacquire lands within reservations that, pursuant to the General Allotment Act of 1887, were allotted to Indians or sold to non-Indians and rebuild pre-1887 tribal reservation land bases through trust land acquisitions for recognized tribes under federal jurisdiction in 1934.  The Jamul Indians were not a recognized tribe under federal jurisdiction in 1934.   Nor was any land owned by Indians living in or around Jamul in 1934 under federal jurisdiction or subject to the 1887 General Allotment Act remedied by the IRA in 1934.

**29.** In 1946, Congress enacted the Indian Claims Commission Act and created the Indian Claims Commission. (60 Stat. 1049.)  The purpose of the Act was to compensate California Indians,

10

as a matter of equity only, for any ancestral or aboriginal claims that may have been relinquished, in part, because Indians did not file timely claims under the Act of 1851.  Under the Indian Lands Commission process, in 1964 a final settlement of over 29 million dollars was divided and paid to California Indians as compensation for all such Indian claims in California.  This comprehensive settlement covered all Indians in California.

## STATEMENT OF FACTS

**30.** The purpose of the ILD is to support the development of a casino complex on the Parcel that would consist of a gaming facility with a total gaming area of 70,000 square feet. In addition to the gaming area square footage, the Proposed Project development would also include 133,000 square feet for support uses such as food and beverage space, public space, gaming support areas, cage area, administration space, storage and mechanical space and an employee area. The total square footage for the Proposed Project would be 203,000 square feet.

**31.** The proposed facility is located approximately 20 miles east of downtown San Diego. The proposed development will cost at least $360 million dollars and will include a three-story gaming and entertainment facility of approximately 200,000 square feet featuring at least 1,700 slot machines, 50 live table games including poker, multiple restaurants, bars and lounges.  The three story casino will be built on top of a seven story partially enclosed parking structure with over 1,900 spaces.

**32.** The JIV was not a "recognized Indian tribe now under federal jurisdiction," on June 18, 1934, when the IRA was enacted. Indeed, the Director of the Office of Tribal Government Services, Carol A. Bacon, stated on July 1, 1993: "that prior to 1980, the Jamul Indian Village was not a federally recognized tribal entity." Exhibit I, at 2.

**33.** "The term "tribe" as used in Federal Indian affairs generally refers to a community of people who have continued as a body politic without interruption since time immemorial and retain

powers of inherent sovereignty. When such a tribe is organized pursuant to the Indian

Reorganization Act (IRA), its governing authority is derived from acknowledgment of the fact

that as a single identifiable group, it has historically governed itself." Exhibit I, at 1.

**34.** As a general matter, to obtain federal recognition, a tribe must demonstrate that it's

"membership consists of individuals who descend from a historical Indian tribe or from

historical Indian tribes which combined and functioned as a single autonomous political

entity." (25 C.F.R. §83.7(3) (2008).)

**35.** The JIV was never a body politic that continued without interruption since time immemorial,

never had powers of inherent sovereignty, and was not a single identifiable group that

historically governed itself or functioned as a single autonomous political entity.

**36.** "During the 1970's representation of the Village explored with the Bureau of Indian Affairs

means whereby it could obtain Federal recognition and were variously advised the only

avenues open to them were to seek a legislative solution, go through the Federal

acknowledgment process, or the more limiting action of recognition by the Secretary as a

half-blood organization. It was pointed out that acknowledgment of existence as an Indian

tribe and of existence as a half-blood community are two different things. In order for the

Secretary to acknowledge the Jamul community as a tribe under 25 CFR Part 83, previously

25 CFR 54, it would have to submit a detailed petition and undergo a lengthy process of

consideration. Several years would have been required to complete this. If the community was

not determined to exist as a tribe after this consideration, it would still have the option to

organize as a half-blood community under the IRA. Representatives of the Village opted to

seek recognition as a **half-blood Indian community** [and not a tribe] even though they were

aware of the limitations that result from organizing as a half-blood Indian community."

Exhibit I, at 2.

12

**37.** "Consequently, on November 7, 1975, the Commissioner of Indian Affairs, in response to the [Sacramento] Area Director's assertion that 20 of the 23 Indians who reside in the Jamul community possess one-half or more degree of Indian blood, notified the Area Director that pursuant to Section 19 of the Indian Reorganization Act (IRA) of June 18, 1934 (25 U.S.C. §479), certain benefits of that Act are available to persons of one-half or more Indian blood even though they lack membership in a federally recognized tribe. The Commissioner found that while **those individuals at Jamul of one-half degree or more Indian blood do not now constitute a federally recognized entity** and do not possess a land base, **they are entitled to services provided by the Bureau to individual Indians pursuant to Section 19 of the IRA**. The commissioner further held that should these Jamul half-bloods secure in trust status, the tract of land on which they reside they would be eligible to organize as a community of adult Indians of one-half degree or more Indian blood under Section 16 of the IRA." Exhibit I, at 2.

**38.** "On July 12, 1979, the Commissioner of Indian Affairs in response to an inquiry advised the Sacramento Area Director [of the BIA] that: 'To be created as a community of persons of one-half degree or more Indian blood, the Jamul Indians must first organize under the Indian Reorganization Act. We understand that the community is currently working on a proposed organizational document. When this proposal has been adopted by the community in an election called by the Secretary, and has been approved by the Secretary, the Jamul Indians will be able to receive services as [such] a community." Exhibit I, at 3.

**39.** "The Jamul Indians lived on one acre of private land and on land deeded to the Diocese of San Diego as an Indian cemetery." Exhibit I, at 3. The Jamul Indians and their lineal descendants have occupied the Parcel which consists of a cemetery and the property contiguous to that Indian graveyard in Jamul, California. The Parcel has been private property since before California became a State. The Parcel has been owned at various times

13

by Mexican Governor and Don, Pio Pico, U.S. General Henry S. Burton and his widow Maria Amparo Ruiz de Burton, John D. Spreckel's Coronado Beach Company, and later by the Lawrence and Donald Daley families, and the Catholic Diocese , as reflected in Exhibits A, B, C, D and F hereto.[1] The Parcel is not and never has been, public domain property, owned by the United States.

**40.** On September 26, 1912, J.D. Spreckel's Coronado Beach Company deeded 2.21 acres of land, later surveyed to include 2.34 acres of land, in Jamul, California, to the Roman Catholic Bishop of Monterey and Los Angeles, a corporate in sole of the State of California, "to be used for the purposes of an Indian graveyard and approach thereto," "to have and to hold the above granted and described premises unto the said Grantee, his successors and assigns **forever** for the purpose above specified," as set forth in Exhibits A and B hereto, which is now known as parcels 597-080-05 and 597-080-06.  In 1912, Father LaPointe and the Roman Catholic church erected a chapel at the cemetery.  Since 1956 the diocese of St. Pius Xavier has maintained the chapel, on the parcel now known as 597-080-05, for the purpose of ministering at the Indian cemetery.

**41.** On December 12, 1978, Lawrence and Donald Daley, recorded the grant deed for 4.66 acres of land, known then as parcel 597-080-01, now known as Parcel 597-080-04 (the Parcel), to "the United States of America in trust for such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate," as set forth in Exhibit D.  This land was conveyed to the United States for the benefit of those half-blood Jamul Indians then occupying the property.

---

[1] See also, *United States v. Pio Pico* (1870) 27 F.Cas. 537; *Estate of Burton* (1883) 63 Cal. 36; *G.W.B.McDonald, Administrator v. Burton* (1886) 68 Cal. 445; *Henry H. Burton v. Maria A. Burton* (1889) 79 Cal. 490; *In re Burton's Estate* (1892) 93 Cal. 459; and *McDonald v. McCoy* (1898) 121 Cal. 55.

**42.** "On June 28, 1979, the United States acquired from Bertha A. and Maria A. Daley a portion of the land known as 'Rancho Jamul' which it took 'in trust for the benefit of such Jamul Indians of one-half degree or more Indian blood as the Secretary of the Interior may designate.' ..The United States accepted these conveyances of land in accordance with the authority contained in Sections 5 and 19 of the Indian Reorganization Act of 1934." Exhibit I, at 3.

**43.** Section 5 of the Indian Reorganization Act of 1934, 25 U.S.C. § 465, permits Defendants to take land into trust for "Indians." Section 19 of IRA in turn defines "Indians" to include: (1) "**any recognized Indian tribe now under Federal jurisdiction**," and (2) "**all other persons of one-half or more Indian blood**." 25 U.S.C. § 479 (emphasis added).   The text of Section 19 has not changed since its enactment in 1934.

**44.** Congress specifically enacted the IRA, 25 U.S.C. 465, to ensure that land acquired in trust for individual Indians would not be alienated by anyone without the government's express approval.  In fact, the IRA continues to specifically provide for the acquisition of land by the United States for the benefit of individual Indians "through purchase, relinquishment, gift, exchange, or assignment...for the purpose of providing land for Indians." 25 U.S.C. 465.

**45.** The 1934 House Report on the IRA clearly evidences a policy that includes acquiring land in trust for individual Indians, and not just for "recognized Indian tribes now under Federal jurisdiction," at the time of the enactment of the IRA: "Section 5 [25 U.S.C. 465] authorizes the Secretary of the Interior to purchase or otherwise acquire land for landless Indians." H.R. Rep. No. 1804, 73d Cong., 2d Sess. 6-7 (1934).

**46.** Furthermore, the federal government has no authority to take land into trust for a tribe that was not federally recognized in June of 1934, but does have the authority, under specified conditions, to take land into trust for individual Indians. *Carcieri v. Salazar* (2009) 555 U.S. 379, 382-3.

15

**47.** As discussed in *Carcieri,* the question is not one of the existence of a tribe or of tribal ancestors in 1934, but one of whether or not a specific tribe can demonstrate that it was *a recognized tribe under federal jurisdiction in* 1934.  The federal government did not have, or recognize, a government to government relationship with the JIV in June 1934. *(Id.)*

**48.** The JIV was not a recognized tribe under federal jurisdiction in 1934.  At most it was a community of individual Indians not affiliated with a tribe. Consequently, the Defendants were without the legal authority to acquire or hold this land, and did not acquire or hold this land, in trust for the JIV as a tribe.

**49.** Furthermore, the JIV was not named among the tribes listed as receiving services from the federal government in 1934, as shown in the 1946 Haas Report entitled Ten Years of Tribal Government under the IRA.

**50.** In addition, the JIV is not named in the BIA's list of Governing Bodies of Indian Groups Under Federal Supervision in 1965.

**51.** Further, Senate Report No. 1874, dated July 1958, notes that the JIV had never received any social services from the BIA due to the status of its members as Indians.

**52.** As Justice Breyer acknowledges in *Carcieri*, at 398, the JIV is not among the list of 258 tribes compiled by the DOI following enactment of the IRA, citing the *amicus* Brief for Law Professors Specializing in Federal Indian Law, at App. 2, No. 12, 2008 WL 3991411.

**53.** Since there was no federally recognized tribe in Jamul, when the IRA was enacted in June 1934, the federal government was only authorized to take land into trust for individual Indians under the IRA.  Therefore, these Jamul Indians of one-half degree or more Indian blood secured in trust status as non-tribal Indians, the tract of land on which they resided.  They also became eligible to organize, and were subsequently organized, as a community of adult Indians of one-half degree or more Indian blood under Section 16 of the IRA.

16

**54.** The JIV did eventually organize themselves as a tribal entity under the IRA. "The Constitution of the Jamul Indian Village was approved by the Deputy Assistant Secretary-Indian Affairs on July 7, 1981. In approving the IRA Constitution, the Village was authorized to exercise those self-governing powers that have been delegated by Congress or that the Secretary permits it to exercise. A number of 'tribes' have been created, from communities of adult Indians, or expressly authorized by Congress under provisions of the IRA and other Federal statutes. For example, some IRA entities availed themselves of the opportunity to adopt an IRA constitution and are considered to be IRA 'tribes.' However, they are composed of remnants of tribes who were gathered onto trust land. Those persons had no historical existence as self-governing units. They now possess only those powers set forth in their IRA constitution. **They are not an inherent sovereign.** Rather, that entity is a created tribe exercising delegated powers of self-government. **Such is the case with Jamul Indian Village**." Exhibit I, at 3.

**55.** Subsequently, on or about, November 24, 1982, an acting Deputy Assistant Secretary of the Bureau of Indian Affairs in the executive branch of the government published the first federal recognition of the Jamul Indian Village ("JIV"), as an Indian tribe, in the Federal Register. 47 Fed. Reg. 53130, 53132 (Nov. 24, 1982). The Supreme Court holds that such publication in the Federal Register provides the evidence of when a tribe is recognized under Federal jurisdiction. *Carcieri*, at 395. Moreover, the Supreme Court also holds that "Congress did not intend to delegate interpretive authority to the Department [of Interior, as to when a tribe was recognized under Federal jurisdiction]." *Carcieri* at 397, J. Breyer, concurring.

**56.** But the JIV's administrative recognition is with the caveat that Congress, as the legislative branch of the United States, has yet to recognize the JIV, and has never lawfully exercised, federal jurisdiction over the JIV.

17

**57.** Most significantly, because the JIV had never previously existed, and was not under federal jurisdiction in June of 1934, the JIV never acquired, nor has been transferred, nor has ever lawfully exercised, governmental power over parcel 597-080-04.  The Supreme Court "has long made clear that Congress–and therefore the Secretary–lacks constitutional authority to 'bring a community or body of people within [federal jurisdiction] by arbitrarily calling them an Indian tribe.'" *Carcieri*, at 412, J. Stevens, dissenting, and citing *United States v. Sandoval* 231 U.S. 28, 46 (1913). Moreover, a tribe cannot establish jurisdiction through its unilateral actions. *Sherrill v. Onedia Indian Nation*, 544 U.S. 197 (2005).

**58.** At the time of the acquisition of the Parcel, the then Secretary of the Interior through his/her subordinates designated the individual Native American families then possessing and residing on parcel 597-080-04, as the beneficial owners of the Parcel, as individual Indians consistent with the federal regulations for unorganized groups of individual Indians, by locating said individual Indians on the parcel, providing for their needs, acquiescing in their continued presence on, and use of, the parcel for more than 28 years, in building houses for them on the parcel, in providing them with services usually accorded to Indians living on such property, allowing them to inhume, inter, deposit, disperse and place the human remains and funerary objects of their dead, below, on, and above the property, and further providing strong and uncontroverted evidence of their designation as the beneficial owners of the parcel 597-080-04, as a matter of law, within the meaning of the grant deed, and as recognized by  *Carcieri v. Salazar* (2009) 555 U.S. 379, 382-83, 388-90, 394-95, 398-99, *Coast Indian Community v. U.S.* (*"Coast"*) (Fed. Cl. 1977) 550 F.2d 639[2], *United States v. Assiniboine Tribe*

---

[2] In *Coast* the Court held on nearly identical facts, that the parcel in question "was not acquired for a tribe, leaving only the possibility under the [Indian Reorganization] Act that it was purchased for individual Indians." 550 F2.d 639, 651, n. 32. The *Coast* deed "was conveyed to the United States: ...'in Trust for such Indians of Del Norte and Humboldt Counties, in California,
(Continued...)

18

("*Assiniboine*") (Fed. Cl. 1970) 428 F.2d 1324, 1329-30, and 1 *Opinions of the Solicitor of the*

*Department of Interior Relating to Indian Affairs 1917-1974* ("*Opinions of the Solicitor*") at

668, 724, 747, and 1479 (1979), attached hereto as Exhibit H, and relied upon by Justices

Breyer and Stevens in *Carcieri* at 399 and 407.

**59.** Thus, the Jamul Indians of one-half degree or more Indian blood were designated the

beneficial owners of the Parcel, and because they could not lawfully transfer that beneficial

interest and trust status to a tribe that was not under federal jurisdiction in June of 1934, the

JIV has never lawfully exercised governmental power over the Parcel, which thereby

precludes the parcel from qualifying for gambling under the IGRA, since it is not "Indian

lands," "over which an Indian tribe exercises governmental power." 25 U.S.C. 2703(4) (B).

**60.** Furthermore, the Jamul Indians of one-half degree or more Indian blood have never attempted

to transfer, nor have they lawfully transferred their individual beneficial interests in the Parcel

to the tribe after it was created and finally recognized in 1982.

**61.** The history of the acquisition and designation of these Jamul Indians of one-half degree or

more Indian blood as the beneficial owners of the Parcel followed the custom and practice of

similar BIA acquisitions and designations of other IRA created tribes, which were

subsequently recognized after June of 1934.  Similar forms of the Jamul grant deed have long

been accepted by the BIA and similar designations of individual Indians' beneficial

ownership have long been made by the BIA, and enforced by the courts. See *Coast*, 550 F.2d

---

(…continued)

eligible to participate in the benefits of the [Indian Reorganization] Act of June 18, 1934, as shall
be designated by the Secretary of the Interior..."' 550 F.2d 641-41. The Jamul deed was conveyed
to the United States "in trust for such Jamul Indians of one-half degree or more Indian blood as
the Secretary of the Interior may designate." See, Ex. D. There, as here, "the United States
acquired the [land]...pursuant to ... 25 U.S.C. 465, which provided that the title to land acquired
under it 'shall be taken in the name of the United States in trust for the...individual Indian for
which the land is acquired...'" *Coast*, 651, n32.

639, 651, n32;  *State Tax Comm.*, 535 F.2d 300, 304; *Assiniboine Tribe* 428 F.2d 1324, 1329; and *Chase v. McMasters* ("*Chase*") 573 F.2d 1011, 1016 (8th Cir. 1978)[3], cert. denied, 439 U.S. 965 (1978).  See also 1 Dept. of Interior, *Opinions of the Solicitor Relating to Indian Affairs, 1917-1974* ("*Opinions of the Solicitor*"), at 668, 724, 747, and 1479 (1979), involving for e.g., the Mississippi Choctaws, the St. Croix Chippewas, the Nahma and Beaver Indians, and the Nooksack Indians, attached as Exhibit H hereto, and acknowledged by Justices Breyer and Stevens in *Carcieri* at 399 and 407.

**62.** The Federal government's own *Handbook of Federal Indian Law*,[4] authorized and funded by Congress in the Indian Civil Rights Act of 1968, 25 U.S.C. 1341(a) (2) provides that "... [A] number of statutes have allowed individual Indians to obtain trust or restricted parcels out of the public domain and not within any reservation. ... The government has at times...purchased trust lands for individuals. Fn. 118. Since 1934 this has been done pursuant to provisions of the Indian Reorganization Act. 25 U.S.C. 465." *Id.*, (DOI 1982) Ch. 1, Sec. D3c, p. 40-41, and (DOI 2005) §3.04 (n114) Footnote 443, citing *City of Tacoma v. Andrus*, 457 F. Supp. 342 (D.D.C. 1978), and *Chase supra.*

**63.** The Parcel, therefore was not acquired for a tribe, nor could it have been acquired for a tribe that did not then exist; instead, it was taken in trust for the individual Native American

---

[3] In *Chase* the court enforced an individual Indian's beneficial ownership of trust land acquired for her benefit under the IRA, stating: "The Secretary may purchase land for an individual Indian and hold title to it in trust for him...Section 465 lists gifts among the means by which the Secretary may acquire land, and it was amended to authorize acquisition of land in trust for individual Indians... See 78 Cong. Rec. 11126 (1934)... The land acquired may be located... without a reservation." *Chase*, at 1016. "The Act not only authorized the Secretary to acquire land for Indians, 25 U.S.C. 465, but continued the trust status of restricted lands indefinitely, 25 U.S.C. 462..." *Chase*, at 1016.

[4] Congress directed the Secretary of Interior to revise and republish Cohen's *Handbook of Federal Indian Law* in the Indian Civil Rights Act of 1968. 25 U.S.C. 1341(a) (2). Hence, the United States is bound by its admissions with regard to the lands held in trust for individual Indians.

families then possessing and residing on the parcel, pursuant to 25 U.S.C. 465, as held in *Carcieri*, and in *Chase, Coast*, *Assiniboine Tribe*, and *Opinions of the Solicitor*, *supra*.

**64.** When the tribe, known as JIV, was subsequently created under the terms of the IRA, it was a landless governmental entity.  To date, no branch of the United States government has set aside or created an Indian reservation for the JIV.

**65.** The United States Department of Interior, Bureau of Indian Affairs, August 3, 2000 response to a Freedom of Information Act (FOIA) request, confirms that the "current trust parcel was accepted into trust in 1978 for Jamul Indians of ½ degree (4.66 acres)," and that there is "no record of the 1978 trust parcel being known as the Jamul Village." Exhibit E.

**66.** This is consistent with the tribe's constitution, Article II, Territory, which does not identify the 4.66 acres, the Parcel (597-080-04), as within the territory of the JIV. Exhibit G.

**67.** The Parcel was not acquired for any Indian tribe, and has never been recognized by any branch of the federal government as being a parcel over which the entity, known as the JIV, exercises governmental power. Nor has it ever been lawfully subject to the exercise of any tribal governmental power.

**68.** During 1996 a faction of individuals, who were not all Jamul Indians of one-half degree of Indian blood, claims to have admitted Jamul Indians, who were only one-quarter Indian blood, as members of the tribe, who now comprise more than a majority of the members of the tribe.  Thus, the JIV is further legally precluded by the 1978 grant deed from claiming any beneficial ownership interest in the Parcel, since JIV now claims to be comprised of a majority of members who are, admittedly, not one-half degree or more of Indian blood.

**69.** The JIV therefore has never had jurisdiction over, nor lawfully exercised governmental power over the Parcel and there has never been a transfer of the Parcel to the subsequently recognized tribe.  Nor has the Secretary of the Interior ever lawfully designated the

subsequently recognized tribe to be a beneficiary of the grant deed for the Parcel.

70. The Defendants have no evidence that the subsequently created "tribe," known as the "Jamul Indian Village," was ever designated as the beneficiary of the Parcel nor that a grant deed ever transferred the Parcel to the tribe.  In fact, the only evidence is that the Secretary of the Interior designated the individual "Jamul Indians of one-half or more Indian blood" to be the beneficiaries of the Parcel, and that they were allowed to reside upon the trust land for 28 years, just as occurred in *Coast*, 550 F.2d at 651, n32; see also Ex. D.

71. Since an Indian tribe's jurisdiction derives from the will of Congress, *United States v. Sandoval* (1913) 231 U.S. 28, 46, citing *United States v. Holliday*, 18 L.Ed. 182, 186; see also, *Kansas v. Norton*, 249 F.3d 1213, 1229-31 (10th Cir. 2001), and Congress never granted the JIV "jurisdiction" over the Parcel to which the U.S. holds title, the express beneficiaries of the deed to the United States for the Parcel were, and still are, the individual half-blood Jamul Indians who have been allowed to reside on the property since 1978, and not the tribal governmental entity that was subsequently recognized by an acting deputy assistant secretary of the BIA in 1982.

72. IGRA only permits gambling on Indian lands "over which an Indian tribe exercises governmental power." 25 U.S.C. 2703(4) (B). "The Secretaries Of The Interior [and the NIGC] have no authority to permit gaming on after acquired trust lands absent the power delegated by Congress in IGRA." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. United States* (7th Cir. 2004) 367 F.3d 650, 657.

73. The government's own *Handbook of Federal Indian Law* explains the significant distinction between (1) taking land into trust for "individual" Indians, before they are allowed to become a recognized tribe under the IRA, as here, and (2) recognizing a landless "tribe" and requiring the Secretary to transfer the land in trust from the individual Indians, with their consent, to the

"tribe," after it was recognized. *Id.*, (DOI 2005) §3.02, p. 135.

**74.** Here, after the tribe was finally recognized in 1982, the government never obtained the consent of the individual Indians to transfer the Parcel into trust for the tribe. Nor did the government ever convey title to the Parcel in trust for the tribe. The Parcel was never taken into trust on behalf of an Indian tribe, and has never been transferred to the JIV; hence, the JIV has never lawfully exercised governmental power over the Parcel.

**75.** Hence, since there was never a subsequent transfer of the individual Indians' beneficial interest in the trust land of the Parcel to the subsequently recognized tribe, the individual beneficial ownership of the Parcel has never been under the governmental power of the JIV, and as such, does not qualify for gambling under 25 U.S.C. 2703, remains subject to California law, including, but not limited to, Public Law 83-280, Cal. Pub. Res. Code and Cal. Health & Safety Codes, and remains held in trust for the beneficial use and quiet enjoyment of the individuals of one-half or more degree of Indian blood who then resided on the Property.

**76.** Therefore, the NIGC's recently published determination that the Parcel qualifies for Indian gaming under IGRA is therefore arbitrary, capricious, and against the law.

**77.** Moreover, consideration and approval of the proposed Management Contract between the JIV and San Diego Gaming Ventures LLC is arbitrary, capricious, and against the law.

**78.** Determining that the Parcel qualifies for Indian gaming under IGRA and approving the proposed Management Contract based on the ILD, after October 17, 1988, is also arbitrary, capricious, and against the law, with regard to taking land into trust for Indian gaming after October 17, 1988, because at least two prior Governors of California have already found the development of a casino on the Parcel would be detrimental to the surrounding community, and the current governor has not concurred that such development would not be detrimental to the surrounding community.

*79.* IGRA further provides with regard to Indian lands acquired after October 17,1988: "Except as provided in subsection (b), gaming regulated by this Act shall not be conducted on lands acquired by the Secretary in trust for the benefit of an Indian tribe after the date of enactment of this Act," Oct. 17, 1988, "unless–(b)(1)(A)...the Secretary, after consultation with the Indian tribe and appropriate State and local officials, including officials of other nearby Indian tribes, determines that a gaming establishment on newly acquired lands would be in the best interest of the Indian tribe and its members, **and would not be detrimental to the surrounding community, but only if the Governor of the State in which the gaming activity is to be conducted concurs in the Secretary's determination**." 25 U.S.C. 2719 (emphasis added).

**80.** "Unless and until the appropriate governor issues a concurrence, the Secretary of the Interior has no authority under §2719(b)(1)(A) to take land into trust for the benefit of an Indian tribe for the purpose of the operation of a gaming establishment...Therefore, while the Secretary of the Interior investigates whether gaming on the proposed trust land 'would be in the best interest of the Indian tribe' and 'would not be detrimental to the surrounding community,' the proper spokesperson for the land in question is necessarily a representative of the state where the land is located." *Lac Courte Oreilles Band of Lake Superior Chippewa Indians v. United States* (7th Cir. 2004) 367 F.3d 650, 656; see also, *Confederated Tribes of Siletz Indians v. United States* (D. Ore. 1994) 841 F. Supp. 1479, 1486.

**81.** Both California Governors, Davis and Schwarzenegger, have already determined that the proposed "gaming establishment" would be "detrimental to the surrounding community." As catalogued in former Governor Davis' July 17, 2001 letter to the Acting Superintendent of the BIA, and Governor Schwarzenegger's September 10, 2004 letter to Clayton Gregory, Pacific Regional Director of the BIA, their determination that such a gaming establishment would be

24

detrimental to the surrounding community is also shared by the local government officials, including then California State Senator David G. Kelley, United States Representative Duncan Hunter, the County of San Diego Board of Supervisors, the Jamul/Dulzura Planning Group, the Endangered Habitats League, and the Back Country Coalition.  As reflected in the public comments to the BIA on February 6, 2003, this determination is also shared by then State Assemblyman, and then Senator, Jay La Suer, the Sierra Club, and the Otay Water District, not to mention 97% of the residents of Jamul.

82. As both Governors Davis and Schwarzenegger inescapably concluded: "The Tribe's proposal is inconsistent with the Multiple Species Conservation Plan, established by the United States Fish and Wildlife Service, the State Department of Fish and Game and the County of San Diego, restrictions on development and presents a serious threat to the viability of a significant portion of the State's recently acquired ecological reserve." "...here, there are significant potentially unmitigable adverse impacts on sensitive State resources..." "...The Bureau's own rules, likewise, compel rejection of this application. In this case, the Tribe's proposed use represents a paradigm for the kind of land use conflicts which the Bureau should not permit to occur..." "...it unnecessarily threatens to degrade significant State environmental resources and is thus inimical to the public health and welfare. We believe that a fair balancing of State and Tribal interests in this instance requires that the Bureau deny the Tribe's application at this time."

83. The NIGC's final agency action, as defined in 25 U.S.C. 2714, in determining that the Parcel "qualifies as 'Indian Lands' pursuant to 25 U.S.C. §2703," will allow the NIGC to approve a Gaming Management Contract and will allow the JIV to build a casino on the Parcel under IGRA.  There is no dispute that, if the NIGC's decision as to the Parcel's qualification for gambling is allowed to stand, the JIV will likely build and operate a casino on the Parcel.

**84.** The NIGC's decision will cause significant harm to the Plaintiffs, long-time residents of Jamul, who are in close proximity to the Parcel that does not qualify for gambling under IGRA.  Plaintiffs reside in the area because of its unique rural setting, and value the quiet life they lead in San Diego County. The construction and operation of a huge casino would destroy the lifestyle they have enjoyed.  Plaintiffs will be disproportionately affected if the JIV is allowed to follow through with its plans to build a 203,000-square-foot casino complex that is anticipated to draw more than 3.2 million visitors a year. Such a casino would detract from the quiet, family atmosphere of the surrounding rural area.

**85.** Among the negative effects of building and operating the anticipated casino in Plaintiffs' community are: (a) an irreversible change in the rural character of the area; (b) loss of enjoyment of the aesthetic and environmental qualities of the agricultural land surrounding the casino site; (c) increased traffic; (d) increased light, noise, air, and storm water pollution; (e) increased crime; (f) diversion of police, fire, and emergency medical resources; (g) decreased property values; (h) increased property taxes; (i) diversion of community resources to the treatment of gambling addiction; (j) weakening of the family conducive atmosphere of the community; and (k) other aesthetic, socioeconomic, and environmental problems associated with a gambling casino.

**86.** Plaintiffs' remedies at law are inadequate. Injunctive relief, both preliminary and permanent, is necessary to prevent irreparable injury.

**87.** It is essential to preserve the status quo and prevent irreparable harm to Plaintiffs for this Court to vacate the ILD and reverse the final agency action determining that the Parcel qualifies as "Indian Lands" under 25 U.S.C. §2703, when it doesn't, and by preventing the NIGC from approving any Management Contract to pursue gaming on the Parcel that does not qualify for gaming under IGRA, 25 U.S.C. §2703.

**88.** After California became a sovereign State of the United States in 1850, on an equal footing with all other States, it received regulatory and police power jurisdiction over all property within the State – including formerly federally owned public domain lands. Once public domain lands are conveyed to the State or into private ownership, the United States retains no regulatory authority over such public domain lands. *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 176 (2009); *Kleppe v. New Mexico* 426 U.S. 529, 540 (1976).

**89.** "The power of the State to regulate the tenure of real property within her limits, and the modes of its acquisition and transfer, and the rules of its descent, and the extent to which a ...disposition of it may be exercised by its owners, is undoubted. It is an established principle of law, everywhere recognized, arising from the necessity of the case, that the disposition of immovable property, whether by deed, descent, or any other mode, is exclusively subject to the government within whose jurisdiction the property is situated...The title and modes of disposition of real property within the State, whether *inter vivos* or testamentary, are not matters placed under the control of Federal authority. Such control would be foreign to the purposes for which the Federal government was created, and would seriously embarrass the landed interests of the State." *United States v. Fox* 94 U.S. 315, 320-21 (1877). "The *Fox* case is only one of a long line of cases which have consistently held that part of the residue of sovereignty retained by the states, a residue insured by the Tenth Amendment, is the power to determine...who may be made beneficiaries," of a deed to the United States. *United States v. Burnison*, 339 U.S. 87, 91-92 (1950).

**90.** Though the Federal government has the power under Article I, Section 8 of the U.S. Constitution to acquire land within a State: "To exercise exclusive legislation in all cases whatsoever,... over all places purchased by the consent of the legislature of the State in which the same shall be, for the erection of forts, magazines, arsenals, dock-yards and other needful

buildings;" and to thereby acquire the "special maritime and territorial jurisdiction," under 18 U.S.C. 7, "by consent of the legislature of the State in which the same shall be," "Without the State's "consent" the United States does not obtain the benefits of Art. I, § 8, cl. 17, its possession being simply that of an ordinary proprietor. *James v. Dravo Contracting Co.*, 302 U.S. 134, 141-142 (1937)." *Paul v. United States* 371, US 245, 264 (1963).

**91.** Upon such land acquisitions by the Federal government as an ordinary proprietor, the United States does not have exclusive jurisdiction over the property. "The Constitution does not command that every vestige of the laws of the former sovereignty must vanish. On the contrary its language has long been interpreted so as to permit the continuance until abrogated of those rules existing at the time of the surrender of sovereignty which govern the rights of the occupants of the territory transferred. This assures that no area however small will be left without a developed legal system for private rights." *Paul v. United States*, 371, US 245, 264-65 (1963).

**92.** The authority to manage and regulate the use of public lands originates in the Property Clause of the U.S. Constitution, which vests in Congress the "power to dispose of and make all needful rules and regulations respecting . . . property belonging to the United States." U.S. Const., Art. IV, § 3, cl. 2.  The Executive Branch historically exercised its own authority to withdraw public lands to create Indian reservations, which the Supreme Court had previously affirmed in *U.S. v. Midwest Oil Co.* 236 U.S. 459 (1915).  However, the Federal Land Policy Management Act ("FLPMA") expressly repealed all grants of authority to the Executive recognized in *Midwest Oil* and 29 prior statutory grants of authority. Act of Oct. 21, 1976, Pub. L. No. 94-579, § 704(a), 90 Stat. 2743, 2792.

**93.** "Ordinarily, an Indian reservation is considered part of the territory of the State." *Nevada v. Hicks* 533, U.S. 353, 361-62 (2001). "It is not unusual for the United States to own within a

28

State lands which are set apart and used for public purposes. Such ownership and use without more do not withdraw the lands from the jurisdiction of the State...A typical illustration is found in the usual Indian reservation set apart within a State as a place where the United States may care for its Indian wards and lead them into habits and ways of civilized life. Such reservations are part of the State within which they lie and her laws, civil and criminal, have the same force therein as elsewhere within her limits, save that they can have only restricted application to the Indian wards." *Surplus Trading Company v. Cook*, 281 U.S. 647, 650 (1930).

94. This is the reason that "Indian reservations, however, are not [exclusive] federal enclaves, and instead represent land owned by the United States for public purposes," which are a subset of partial federal enclaves where the State has never consented to cede its jurisdiction over the land to the United States. *Carcieri v. Norton* (1st Cir. 2005) 398 F.3d 22, 31-32. "State sovereignty does not end at a reservation's border." *Nevada v. Hicks,* 533 U.S. 353, 361 (2001), quoting *Worcester v. Georgia*, 31 U.S. (6 Pet.) 515, 561.

95. After public domain property is conveyed to the State, or into private ownership, the United States no longer has authority to acquire non-public domain lands, without condemnation or consent of the State. *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163, 176 (2009). Moreover, in 1864, Congress limited the number of Indian Reservations that could be created in California from public domain lands to four, (13 Stat. 39.) and thereafter did not create a reservation for the JIV.

96. In the case of *Hawaii v. Office of Hawaiian Affairs*, 556 U.S. 163 (2009), a unanimous Supreme Court held that after federal public domain lands pass out of federal ownership to a State, they cannot be restored to federal jurisdiction by a unilateral federal act that purports to change the nature of the original grant of jurisdiction to the State, without the consent of the

State. The Supreme Court concluded that "it would raise grave constitutional concerns" if Congress sought to "cloud [the State's] title to its sovereign lands" after it had joined the Union. "We have emphasized that Congress cannot, after statehood, reserve or convey…lands that have already been bestowed upon a state…" *Hawaii v. Office of Hawaiian Affairs*, at 176.

**97.** Here, the Parcel was never reserved or withdrawn from public domain lands to create an Indian reservation. Prior to the Daley grant deed in 1978, the Parcel had always been privately owned; first within Mexico, then the Republic of California, then within the United States when acquired from Mexico by way of the Treaty of Guadalupe-Hildalgo of 1848, 9 Stat. 926, and then within the State of California.  When the State of California entered the Union on September 9, 1850, on an equal footing with all other States, per Article 1V, Section 3 of the U.S. Constitution, the Parcel was still privately owned and within the exclusive jurisdiction of the State of California.

**98.** When the Daleys deeded the Parcel to "the United States in trust for those Jamul Indians of one-half degree or more Indian blood as the Secretary shall designate," in 1978, the State of California never ceded jurisdiction over the Parcel to the United States. This is confirmed by the lack of any "notice of such acceptance" of the "cession of such jurisdiction, exclusive or partial," having been filed with the Governor of the State of California, as required by 40 U.S.C. 255, and the "index of record of documents with description of the lands over which the United States acquired jurisdiction," required by Cal. Govt. Code 127.

**99.** California's general consent to the acquisition of state lands by the United States is limited to lands lawfully purchased or condemned, as set out in Government Code §110, and does not apply to gifts, as made by the Daleys here.  Thus, the Parcel remains within the concurrent jurisdiction of the State of California today.  California's jurisdiction over such land as is subsequently acquired by the United States in trust for the benefit of individual Indians under

the IRA, 25 U.S.C. 465, extends to all matters not interfering with the control which federal government has exercised over Indian affairs, as held in *Acosta v. County of San Diego* (1954) 126 Cal. App. 2d 455. Moreover, the Supreme Court has acknowledged that Congress' power to exercise control over Indian affairs, still has "constitutional limits" if its Indian legislation "interferes with the power or authority of any State." *United States v. Lara*, 541 U.S. 193, 205, (2004); *Gila River Indian Cmty. v. United States* (9th Cir. May 20, 2013) 2013 U.S. App. LEXIS 10056, *91, J. Smith, dissenting.

**100.**    California's general consent to federal acquisition of lands is further qualified by the requirement that the acquisition be pursuant to "the laws under which the purchase or condemnation is made." Cal. Govt. Code §110.  Therefore, since the Parcel has never been taken into trust for any tribe, nor transferred to any tribe, any subsequent acquisition by the United States, through purchase or condemnation of the Parcel, in trust for a tribe, will be after October 17, 1988, and therefore will not obtain the state's general consent to cede jurisdiction to the United States, nor qualify for gambling under IGRA, where, as noted above, the Governor has not concurred in a determination that "a gaming establishment on newly acquired lands would not be detrimental to the surrounding community." 25 U.S.C. 2719.

**101.**    Moreover, the United States cannot acquire its "special maritime and territorial jurisdiction," over "Any lands reserved or acquired for the use of the United States, and under the exclusive or concurrent jurisdiction thereof, or any place purchased or otherwise acquired by the United States" without the "consent of the legislature of the State in which the" Parcel is located. 18 U.S.C. 7.

**102.**    Therefore, the NIGC's determination that the Parcel qualifies for gambling under IGRA, and consideration of the approval of the proposed Management Contract for gambling on the

31

Parcel, is an unconstitutional infringement of California's jurisdiction over the Parcel, private land titles, and State and local police power in violation of the principals of federalism embodied in the 10th Amendment to the U.S. Constitution.  California has never consented to cede its jurisdiction over the Parcel to the United States, and the Parcel has never been, and cannot now become, exclusively federal public domain land and is, instead, land that has been transferred to the State while owned by private owners, and now owned by the United States in fee as any other ordinary proprietor, subject to California's retained jurisdiction.

103.    In summary the NIGC's April 10, 2013 ILD first included in the SEIS is a final agency action that the Parcel occupied by some Indians living in Jamul "qualifies as 'Indian Lands' pursuant to 25 U.S.C. §2703."  (See Ex. J.)  The ILD is therefore subject to review by this Court.  This final agency action is an unlawful and *ultra vires* decision, that must be reversed and an injunction entered to prevent unlawful gambling on the Parcel.  Defendants have no authority to take such final agency action or to approve the Management Contract for gambling, because the Parcel does not qualify as "Indian Lands" under 25 U.S.C. §2703..  The IRA only permits land to be taken into trust for Indian tribes that were recognized under Federal jurisdiction as of June 1934, when the IRA was enacted, and the JIV was not recognized under federal jurisdiction on June 18, 1934.  Also the Parcel was not taken into trust for the JIV and was never transferred to the beneficial interest of the JIV, and therefore does not qualify for gaming under 25 U.S.C. 2703, because the JIV has never lawfully exercised governmental power over the Parcel.  Furthermore, although it was included in an SEIS as a prerequisite for the Gambling Management Contract project, the Defendants have completely failed to comply with NEPA with respect to the ILD.  The ILD is arbitrary and capricious and contrary to law.  It is not supported by any evidence in the record.  It should be reversed and vacated by this Court.

**FIRST CLAIM FOR RELIEF**

**Defendants' Violation of the Indian Reorganization Act of 1934**

**104.**     Plaintiffs repeat and re-allege paragraphs 1 through 103 inclusive, of this Complaint, as if fully set forth here.

**105.**     Under the IRA, the DOI is authorized to take land into trust for only those federally recognized tribes that were under federal jurisdiction in June 1934.  25 U.S.C. §§ 465, 467, & 479; *Carcieri v. Salazar, supra.*

**106.**     The Indians living in or around Jamul were not a federally recognized tribe in June 1934 when Congress  enacted the IRA

**107.**     The Indians living in or around Jamul are not eligible to have lands placed into trust status under the IRA 465 on their behalf because they were not a federally recognized tribe nor under federal jurisdiction in 1934 as required by Supreme Court in *Carcieri.*

**108.**     There is no other act, statute or regulation in existence that authorizes the Defendants to take the Parcels into trust on behalf of the JIV Indians.

**109.**     There is no evidence referenced in the ILD that supports the Defendants' conclusion that the Parcel is a reservation or that it qualifies for gambling as "Indian lands" under 25 U.S.C. §2703.  Moreover, there is no evidence that the JIV were "recognized under federal jurisdiction" in June of 1934 as required by the IRA for acquisition of land by a tribe. There was no ongoing government-to-government relationship between the United States and the JIV or any assertion of authority by the United States over the JIV in June of 1934. Any intermittent contact that might have occurred between the Federal Government and individual Indians who have sporadically lived off and on in Jamul is insufficient to constitute recognition of an Indian tribe under Federal jurisdiction in June of 1934. The Indians living in Jamul were geographically dispersed, not residing on any one parcel of land, and lacked any

33

tribal organization whatsoever as of June 1934. Moreover, these nomadic Indians avoided contact and had no government to government relationship with any of the foreign and domestic governments claiming to have exercised governmental power over the land upon which they lived.

110.    Defendants' decision that the Parcel qualifies for gambling under 25 U.S.C. 2703 is arbitrary, capricious, an abuse of discretion, unsupported by substantial evidence, beyond the scope of the Secretary's authority under the IRA, and issued in a manner not in accordance with law. 5 U.S.C. § 706 (2).

111.    In addition, there is an actual controversy between the parties, within the meaning of the federal Declaratory Relief Judgment Act (28 U.S.C. § 2201) and an actual case and controversy under Article III of the United States Constitution, regarding the eligibility of an unrecognized Indian community, such as the Indians living in and around Jamul, to receive or hold trust lands under the IRA as a tribe.  The Supreme Court in *Carcieri* held that only recognized tribes under federal jurisdiction in 1934 are eligible for a trust transfer as a tribe. Despite the Supreme Court's decision in *Carcieri*, the Defendants concluded in the ILD that the Parcel was a reservation and Indian lands eligible for gambling under IGRA.  A declaratory judgment by this Court reaffirming that the *Carcieri* test is applies in this case, and confirming that the Jamul Indians were not a recognized tribe in 1934, is necessary and proper.

112.    Plaintiffs' remedies at law are inadequate. Injunctive relief, both preliminary and permanent, is necessary to prevent irreparable injury to the Plaintiffs. In the absence of the relief requested in this action, an unlawful casino complex will be allowed to open and operate in San Diego County.

34

### SECOND CLAIM FOR RELIEF

**Defendants' Infringement of State Jurisdiction Over Non-Public Domain Property**

113.    Plaintiffs repeat and re-allege paragraphs 1 through 112 inclusive, of this Complaint, as if fully set forth here.

114.    After California became a sovereign State of the United States in 1850, on an equal footing with all other States, it received regulatory and police power jurisdiction over all property within the State – including federally owned public domain lands.  Until public domain lands are conveyed to the State or into private ownership, the United States retains limited regulatory authority over public domain lands if necessary to further a federal purpose.  *Kleppe v. New Mexico* 429 U.S. 873 (1976).

115.    Thus, the United States has the authority, in some circumstances, to create an Indian reservation from retained public domain lands.   By definition, an Indian reservation is created by the Secretary, or an authorized federal land officer, executing an order withdrawing specific parcels from public domain land and reserving it for the specific purpose of the withdrawal order.  *See U.S. v. Midwest Oil Co.* 236 U.S. 459 (1915).

116.    After public domain property is conveyed to the State, or into private ownership, the United States no longer has authority to create an Indian reservation over non-public domain lands.  In the case of *Hawaii v. Office of Hawaiian Affairs*, 129 S Ct. 1436 (2009), a unanimous Supreme Court held that after federal public domain lands pass out of federal ownership to a State, they cannot be restored to federal jurisdiction by a federal act that purports to change the nature of the original grant of jurisdiction to the State.

117.    As a consequence of the rules summarized in the *Hawaii* decision, once public domain land is conveyed by the United States to a State, or into private ownership subject to the police and taxing power of the State, it cannot thereafter be returned to public domain status

35

by declaring that it is a reservation or as part of a trust transfer under the IRA.

118.   The Supreme Court concluded that "it would raise grave constitutional concerns" if Congress sought to "cloud Hawaii's title to its sovereign lands" after it had joined the Union. "We have emphasized that Congress cannot, after statehood, reserve or convey…lands that have already been bestowed upon a state…" *Hawaii v. Office of Hawaiian Affairs*, *supra.*

119.   The State of California entered the Union on September 9, 1850, on an equal footing with all other States.  As is the case with all States, public domain lands in California were to be transferred to either the State or into private ownership subject to State jurisdiction and regulation. California's Act of Admission mandated that California shall never interfere with the primary disposal of public domain lands by the United States.  (9 Stats. 452.)

120.   In addition, in 1864, Congress limited the number of Indian Reservations that could be created in California from public domain lands to four.  (13 Stat. 39.)  The remainder of the public domain land was to be transferred to the State or sold into private ownership development.

121.   The Defendants' decision in the ILD that the Parcel is reservation or Indian lands eligible for gambling free from State and local regulation and taxation, as though it is public domain land, is an unconstitutional infringement on private land titles and on State and local police power to regulate its citizenry for the benefit of all citizens.  It is also a violation of the equal footing doctrine and the principles of federalism outlined by the Supreme Court in *Hawaii v. Office of Hawaiian Affairs*, and in the Tenth Amendment of the Constitution.

122.   The decision  by the Defendants in the ILD to treat the Parcel as reservation or Indian lands exempt from State and local regulation and taxation, is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law.  5 U.S.C. § 706.  The ILD should be vacated and its implementation enjoined.

123.     There is an actual controversy between the parties, within the meaning of the federal

Declaratory Relief Judgment Act (28 U.S.C. § 2201) and an actual case and controversy under

Article III of the United States Constitution, regarding whether the Defendants can hold the

Parcel free from State and local regulation and taxation.  The Supreme Court in *Hawaii* held

that that the federal government cannot, after statehood, reserve, convey, or regulate lands that

are no longer public domain lands as though they were public domain lands.  In contrast, the

Defendants claim that they have the authority to acquire and hold lands into trust for the JIV

free of State and local regulation.  A declaratory judgment by this Court in this case on these

issues is necessary and proper.

124.     Plaintiffs' remedies at law are inadequate. Injunctive relief, both preliminary and

permanent, is necessary to prevent irreparable injury to the Plaintiffs. In the absence of the

relief requested in this action, an unlawful casino complex will be allowed to open and

operate in San Diego County.

### THIRD CLAIM FOR RELIEF

#### Defendants' Violation of the Indian Gaming Regulatory Act

125.     Plaintiffs repeat and re-allege paragraphs 1 through 124 inclusive, of this Complaint, as if

fully set forth here.

126.     The Defendants' determination in the ILD that the Parcel is a reservation or Indian lands

eligible for gambling under IGRA is arbitrary and capricious and contrary to law.

127.     Based on this unlawful reservation or Indian lands determination in the ILD, the

Defendants are trying to facilitate a major casino on the Parcel in violation of IGRA and State

law and to the detriment of the Plaintiffs.

128.     As a result of this unlawful determination, if the ILD is not vacated and the Parcel is

accepted as Indian lands eligible for gambling for IGRA purposes, the JIV Indians  will be

37

allowed to build a Class III casino on the Parcel which will cause major environmental impacts in and around the town of Jamul and San Diego County and irreversible harm to the Plaintiffs and their members and community.

129.    The Defendants' determination that the Parcel is a reservation or Indian land  available for gaming is arbitrary, capricious and not in accordance with law.  (5 U.S.C. § 706.)

130.    There is an actual controversy between the parties, within the meaning of the federal Declaratory Relief Judgment Act (28 U.S.C. § 2201) and under Article III of the United States Constitution, regarding whether the ILD complies with the provisions of IGRA.  A declaratory judgment by this Court on these issues is necessary and proper.

131.    Plaintiffs' remedies at law are inadequate. Injunctive relief, both preliminary and permanent, is necessary to prevent irreparable injury to the Plaintiffs. In the absence of the relief requested in this action, an unlawful casino complex will be allowed to open and operate in San Diego County.  It should be vacated and enjoined

**FOURTH  CLAIM FOR RELIEF**

**DOI's and NIGC's violation of the National Environmental Policy Act**

132.    Plaintiffs repeat and re-allege paragraphs 1 through 131 inclusive, of this Complaint, as if fully set forth here.

133.    The Defendants approval of the ILD violates National Environmental Policy Act (NEPA; 42 U.S.C. § 4321 et. seq.) and it's implementing regulations. 40 C.F.R. 1500 et seq.  The Defendants did not prepare an environmental assessment or take any steps to comply with NEPA before approving the ILD.

134.    NEPA requires that "all agencies of the Federal Government shall…include in every recommendation or report on…major Federal actions significantly affecting the quality of the human environment, a detailed statement by the responsible official."  (42 U.S.C. § 4332.)

135.     Plaintiffs' interest in the environmental and economic well-being of Jamul and its rural community are among the interests to be considered under 25 C.F.R. § 151.10(f), 151.10 (h) before land is placed or held in trust. Defendants ignored or failed to adequately consider or mitigate the environmental impacts of the proposed Jamul Casino on the surrounding community, including the socio-economic impact, such as the impacts associated with crime and problem gambling, and the impacts on public and social services, such as wastewater service, fire and emergency medical services, law enforcement, housing, roads and transportation resources, schools, and other public and social services.

136.     Defendants' failed to take a proper "hard look" at the environmental impact of the proposed mega-casino development. 42 U.S.C. § 4321 *et seq.*; 40 C.F.R. § 1508.8 including: (a) transportation and traffic, (b) road access, (c) fire and emergency services, (d) biology and the Multiple Species Conservation Plan for the neighboring Rancho Jamul Ecological Preserve,  (e) failure to comply with CEQA and NEPA, (f) hydrology and water quality,  (g) groundwater resources, (h) soils and geology, (i) cultural and archeological resources, not to mention the interment of human remains and funerary objects on the Parcel, (j) noise, (k) air quality and climate change, (l) wastewater treatment, (m) electrical power, (n) visual impacts, (o) community character, (p) growth, and (q) Jamul's dark skies.

137.     Defendants also failed to fully consider or adequately assess the impact that the ILD will have on local communities, as required by 25 C.F.R. § 151.10(e) and NEPA, and proposed inadequate mitigation for these impacts.

138.     Defendants failed to adequately consider alternatives to approving the Management Contract as required by 40 C.F.R. § 1502.14. Defendants were required to "[r]igorously explore and objectively evaluate all reasonable alternatives …." *Id.* Yet the Defendants failed to adequately consider even whether the JIV could develop gambling on the Parcel.

39

139.    Defendants failed to conduct a fair, unbiased and complete analysis of the human impacts that will be caused by approving the Management Contract, as required by NEPA. In particular, Defendants failed to adequately consider the detrimental economic impacts on tribal governmental operations and member services that the mega-casino development will have on the Sycuan, Viejas and Campo tribes, including loss of jobs, inability to make per capita payments to its citizens, reduction and/or elimination of existing government programs, elimination of community initiative and contributions to local organizations.

140.    Defendants failed to comply with 40 C.F.R. § 1506.5 and 1506.6 in conducting public hearings, in conducting the public participation and public hearing process, and in reviewing and approving the proposed SEIS in violation of the APA. 5 U.S.C. §§ 702, 704,706

141.    The DOI failed to ensure complete and proper public participation, including by failing to properly consult under 25 C.F.R. Part 292, properly consider comments of, and allow or adequate participation by the general public, by denying access and time to certain participants at the expense of other participants, and by denying requests to extend or reopen the comment period and the public hearing process.

142.    For all of these reasons, Defendants have overlooked the obvious, a mega- casino boasting a 203,000 square foot gambling hall, 1,900 parking spaces located in the community of Jamul and adjacent to the main inland arterial highway to Mexico, SR 94, will clearly have detrimental impacts on the surrounding community and cause Plaintiffs irreparable damage.

143.    The proposed casino project that will be constructed and implemented as a result of the ILD has many inherent well documented negative impacts that threaten this small, rural community with among other things: (a) environmental and economic impacts on Jamul and San Diego County, (b) infringement upon the tribal sovereignty of other Native Americans, including those at Sycuan, Viejas and Campo; (c) the impact gambling addicts have on their

40

families, employers, and community social services; (d) impacts on water supply and water wells on adjacent farms and homes; (e) increase in crime and prostitution; and (f) the destructive and ruinous impacts upon families caused by gambling. None of these impacts were identified, much less adequately considered, mitigated or resolved, before the ILD was approved on April 10, 2013.

**144.**    The Defendants were  required to take a "hard look" at the environmental consequences of the Indian lands determination in the ILD.  This required the Defendants to: (1) make a good faith effort to take environmental values into account; (2) to provide full environmental disclosure to the members of the public; and (3) protect the integrity of the decision making process by insuring that problems are not ignored.

**145.**    The failure of the Defendants to comply with NEPA or to take a "hard look" at, and adequately address, the adverse environmental and socio-economic impacts of all the anticipated impact of the impacts of the ILD is arbitrary, capricious, an abuse of discretion, and otherwise not in accordance with law (5 U.S.C. § 706.)

**146.**    There is an actual controversy between the parties, within the meaning of the federal Declaratory Relief Judgment Act (28 U.S.C. § 2201) and an actual case and controversy under Article III of the United States Constitution, regarding whether the ILD complies with the provisions of NEPA.  A declaratory judgment by this Court on these issues is necessary and proper.

**147.**    Plaintiffs' remedies at law are inadequate. Injunctive relief, both preliminary and permanent, is necessary to prevent irreparable injury to the Plaintiffs. In the absence of the relief requested in this action, an unlawful casino complex will be allowed to open and operate in San Diego County.  The Defendants' approval of the ILD should be vacated and should be enjoined until the Defendants completely comply with NEPA.

41

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiffs, JAC and JCC, respectfully request that this Court enter judgment in their favor and against Defendants, and each of them, as follows:

A.   That this Court declare, adjudge, and decree that the Defendants are without authority to take or hold the Parcel in trust for the JIV and that the ILD that the Parcel is reservation or Indian lands eligible for tribal gaming is arbitrary, capricious, and contrary to law and exceeds the authority, if any, delegated to the Defendants under the IRA;

B.   That this Court declare, adjudge, and decree that the Defendants' approval and implementation of the ILD or that the Parcel is in trust for the JIV as a federally recognized tribe violated the IRA and its implementing regulations;

C.   That this Court declare, adjudge, and decree that the ILD is contrary to law, including but not limited to IGRA and order the Defendants to set aside and vacate the ILD and enjoin its implementation;

D.   That this Court declare, adjudge, and decree that the Defendants failed to comply with NEPA when it approved the ILD;

E.   That this Court declare, adjudge, and decree that the Defendants have no authority to take the Parcel, which is held in fee and is not public domain land, in trust for the JIV free of State and local taxation and regulation and that the decision in the ILD to do so is arbitrary, capricious and contrary to law;

F.   That this Court enter judgment and an order enjoining the Defendants from approving or implementing any aspect of the ILD;

G.   That this Court enter judgment and an order enjoining the Defendants from approving or implementing any aspect of the proposed Gaming Management Contract.

H.   That this Court enter judgment and an order awarding Plaintiffs' costs and reasonable

42

attorney's fees as permitted by law including the Equal Access to Justice Act; and

I.    That this Court award the Plaintiffs such further relief as to the Court deems just and proper.


Dated:  September 15, 2013

Respectfully submitted,

/s/Kenneth R. Williams

KENNETH R. WILLIAMS
*Attorney for Plaintiffs*

43