1

2

3

4

5

6

7

8                          UNITED STATES DISTRICT COURT

9                    FOR THE EASTERN DISTRICT OF CALIFORNIA

10

11   JAMUL ACTION COMMITTEE, et al.,              No.  2:13-cv-01920-KJM-KJN

12                    Plaintiffs,

13          v.                                     ORDER

14   JONODEV CHAUDHURI, Acting
     Chairman of the National Indian Gaming
15   Commission, et al.,[1]

16                    Defendants.

17

18

19               The Jamul Action Committee, several of its individual members, and the Jamul

20   Community Church are the plaintiffs here.  For convenience, the court refers to them together as

21   the JAC.  The JAC opposes construction of a casino by the Jamul Indian Village near Jamul,

22   California, and has moved for a "writ of mandate" and preliminary injunction.  It seeks an order

23   enjoining construction of the casino and requiring completion of certain federal environmental

24   reviews before construction can continue.  After reviewing the arguments in support of and in

25               [1] The defendants have notified the court that Tracie Stevens is no longer an employee of
26   the National Indian Gaming Commission and that Jonodev Chaudhuri has been substituted for
     Tracie Stevens pursuant to Federal Rule of Civil Procedure 25(d), which substitutes "an officer's
27   successor . . . automatically as a party" and provides that "[l]ater proceedings should be in the
     substituted party's name."  See Fed. Defs.' Opp'n 2–3 n.3 (noting the substitution).
28

                                                   1

1  opposition to the motion, the court determined a hearing was not necessary, and now DENIES the
2  motion.

3  I.      INTRODUCTION

4          The Jamul Indian Village (the Tribe) is a federally recognized tribal entity entitled
5  to tribal sovereign immunity.  Order Aug. 5, 2014, at 7, ECF No. 50.  The Tribe has not
6  consented to this court's jurisdiction and is not a defendant here.

7          The defendants fall into two categories.  First are several employees, officials, or
8  appointees of the National Indian Gaming Commission (NIGC), the Department of the Interior
9  (DOI), the Bureau of Indian Affairs (BIA), and those agencies themselves (for convenience, the
10  federal defendants).[2]  Second are several individual Tribal council members or officials and
11  several corporations participating in the construction of the casino, including Penn National, Inc.,
12  San Diego Gaming Village, LLC (SDGV), and C.W. Driver (collectively, the tribally affiliated
13  defendants).[3]  Both the federal and tribally affiliated defendants have filed oppositions to the
14  JAC's motion.  Fed. Defs.' Opp'n, ECF No. 63; Tribal Defs.' Opp'n, ECF No. 62.

15          Several statutory regimes guide the resolution of this matter, and a brief discussion
16  of each lays the foundation for the court's analysis.

17          A.      The Indian Gaming Regulatory Act

18          Congress passed the Indian Gaming Regulatory Act (IGRA) in 1988 to provide for
19  the operation and regulation of gaming by Indian tribes.  *Seminole Tribe of Fla. v. Fla.*, 517 U.S.
20  44, 48 (1996).  The IGRA's purposes are (1) to "promot[e] tribal economic development, self-
21

22          [2] The second amended complaint, the operative pleading, names the following federal
23  defendants in particular: Tracie Stevens, Chairwoman of the NIGC; Jonodev Chaudhuri, Acting
    Chairman of the NIGC; Sally Jewell, Secretary of the DOI; Kevin Washburn, Assistant Secretary
24  of the DOI for Indian Affairs; Paula L. Hart, Director of the Office of Indian Gaming for the BIA;
    Amy Dutschke, Regional Director for the Pacific Region of the BIA; John Rydzik, Chief of the
25  Environmental Division of the BIA; and Dawn Houle, Chief of Staff of the NIGC.  Second Am.
    Compl. ¶ 10, ECF No. 51; *but see* note 1 *supra*.
26
          [3] The second amended complaint names the following tribally affiliated defendants:
27  Raymond Hunter, Charlene Chamberlain, Robert Mesa, Richard Tellow, and Julia Lotta. Second
    Am. Compl. ¶ 13, ECF No. 51.
28

1    sufficiency, and strong tribal governments"; (2) "to shield [an Indian tribe] from organized crime

2    and other corrupting influences, to ensure that the Indian tribe is the primary beneficiary of the

3    gaming operation, and to assure that gaming is conducted fairly and honestly by both the operator

4    and players"; (3) to declare the necessity of "the establishment of independent Federal regulatory

5    authority for gaming on Indian lands, . . . Federal standards for gaming on Indian lands, and . . . a

6    National Indian Gaming Commission" for meeting Congress's "concerns regarding gaming"; and

7    (4) to protect gaming "as a means of generating tribal revenue." 25 U.S.C. § 2702.

8            An Indian tribe has "the exclusive right" to regulate gaming on Indian lands unless

9    prohibited by federal or state law. 25 U.S.C. § 2701(5). IGRA divides gaming into three classes.

10   *Michigan v. Bay Mills Indian Cmty.*, ___ U.S. ___, 134 S. Ct. 2024, 2028 (2014). Class III is the

11   most heavily regulated and includes the types of games one might expect to find in a casino, such

12   as slot machines. *Id.* (citing 25 U.S.C. § 2703(8)). An Indian tribe may conduct Class III gaming

13   on its land only as provided by a compact negotiated with the surrounding U.S. State. *Id.* (citing

14   25 U.S.C. § 2710(d)(1)(C)). Class II gaming includes bingo and card games. 25 U.S.C.

15   § 2703(7)(A). The NIGC regulates Class II gaming on Indian lands, including by approving a

16   tribe's Class II gaming ordinance, monitoring gaming, and inspecting gaming facilities. *See id.*

17   §§ 2706(b)(1)–(2), 2710(b). Class I gaming includes "social games solely for prizes of minimal

18   value or traditional forms of Indian gaming engaged in by individuals as a part of, or in

19   connection with, tribal ceremonies or celebrations." *Id.* § 2703(6). "Class I gaming on Indian

20   lands is within the exclusive jurisdiction of the Indian tribes . . . ." *Id.* § 2710(a)(1).

21           The NIGC is IGRA's regulatory commission. *Id.* § 2703. It has powers to

22   approve its own budget, collect civil fines, establish fee rates, make permanent the Chairman's

23   order temporarily closing a gaming facility, monitor and inspect Class II gaming, conduct

24   background investigations, inspect records, procure supplies, enter contracts with public and

25   private entities, hold hearings, administer oaths, and promulgate implementing regulations. *Id.*

26   § 2706. The NIGC Chairman has power to "(1) issue orders of temporary closure of gaming

27   activities . . . ; (2) levy and collect civil fines . . . ; (3) approve tribal ordinances or resolutions

28   regulating class II gaming and Class III gaming . . . ; and (4) approve management contracts for

Class II gaming and class III gaming," *id.* § 2705(a), and as delegated by the NIGC, *id.*§ 2705(b). The statute does not empower the NIGC to regulate, monitor, or inspect Class III gaming; tribal-state compacts govern Class III gaming activities. *See Colorado River Indian Tribes v. Nat'l Indian Gaming Comm'n*, 466 F.3d 134, 137–40 (D.C. Cir. 2006) (affirming the district court's determination that no statutory basis empowers the NIGC to regulate Class III gaming operations).

An Indian tribe need not manage its own gaming operations.  IGRA allows a tribe to enter contracts with third parties to manage Class III gaming, but only if the contract "has been submitted to, and approved by, the [NIGC] Chairman."  25 U.S.C. § 2710(d)(9); 25 C.F.R. § 533.1.  Congress has listed specific determinations the Chairman must make.  *See* 25 U.S.C. § 2711(b).[4]  The NIGC's regulations also describe the standards against which the Chairman measures a submitted contract.  *See* 25 C.F.R. §§ 531.1 (required contents), 531.2 (prohibited

---

[4] Section 2711(b) provides in full as follows:

The Chairman may approve any management contract entered into pursuant to this section only if he determines that it provides at least—

(1) for adequate accounting procedures that are maintained, and for verifiable financial reports that are prepared, by or for the tribal governing body on a monthly basis;

(2) for access to the daily operations of the gaming to appropriate tribal officials who shall also have a right to verify the daily gross revenues and income made from any such tribal gaming activity;

(3) for a minimum guaranteed payment to the Indian tribe that has preference over the retirement of development and construction costs;

(4) for an agreed ceiling for the repayment of development and construction costs;

(5) for a contract term not to exceed five years, except that, upon the request of an Indian tribe, the Chairman may authorize a contract term that exceeds five years but does not exceed seven years if the Chairman is satisfied that the capital investment required, and the income projections, for the particular gaming activity require the additional time; and

(6) for grounds and mechanisms for terminating such contract, but actual contract termination shall not require the approval of the Commission.

provisions), 533.3 (required contents of a request for approval of a contract), 533.6 (requirements for managing personnel or persons with financial interests).  Management contracts may not include provisions "transfer[ring] or, in any other manner, convey[ing] any interest in land or other property," unless specified in the contract in writing and permitted by statutory law.  25 C.F.R. § 531.2.

### B.    The National Environmental Protection Act

The National Environmental Protection Act (NEPA) "was intended to reduce or eliminate environmental damage and to promote 'the understanding of the ecological systems and natural resources important to' the United States."  *Dep't of Transp. v. Pub. Citizen*, 541 U.S. 752, 756 (2004) (quoting 42 U.S.C. § 4321).  NEPA does not require one result or another; rather, it requires federal agencies follow certain procedures designed to call attention to the environmental impacts of their proposals and actions.  *Id.* at 756–57.  The "heart" of these procedures is the requirement that a federal agency include with its proposals and actions a "detailed statement" about

> (i) the environmental impact of the proposed action,
>
> (ii) any adverse environmental effects which cannot be avoided should the proposal be implemented,
>
> (iii) alternatives to the proposed action,
>
> (iv) the relationship between local short-term uses of man's environment and the maintenance and enhancement of long-term productivity, and
>
> (v) any irreversible and irretrievable commitments of resources which would be involved in the proposed action should it be implemented.

*Id.* (quoting 42 U.S.C. § 4332(2)(C)).  This detailed statement is called an Environmental Impact Statement (EIS).  *Id.*  Federal agencies must also update an EIS after the appearance of "'significant new circumstances or information relevant to environmental concerns and bearing on the proposed action or its impacts.'"  *Marsh v. Oregon Natural Res. Council*, 490 U.S. 360, 372 (1989) (quoting 40 C.F.R § 1502.9(c) (1987)).

In advance of only "major Federal actions" does NEPA require an agency to prepare an EIS. 42 U.S.C. § 4332(C); *Hale v. Norton*, 476 F.3d 694, 700 (9th Cir. 2007). The regulations implementing NEPA define "major federal action." *See* 40 C.F.R. § 1508.18. The definition encompasses actions with potentially major effects, which effects "are potentially subject to Federal control and responsibility." *Id.* "Actions" describes both affirmative acts and omissions of duty reviewable under the Administrative Procedure Act or a similar law. *Id.* "Actions" may be both "new and continuing," and include "projects and programs entirely or partly financed, assisted, conducted, regulated, or approved by federal agencies . . . ." *Id.* § 1508.18(a). The regulations describe several categories of typical federal actions, including adoption of new policies and rules, new plans, programs, and, most relevant here, "[a]pproval of specific projects, such as construction or management activities located in a defined geographic area." *Id.* § 1508.18(b)(4). A federal agency may take an "action" by approving a project by permit or other regulatory decision, and "project" includes "federally assisted activities." *Id.*

The IGRA and NEPA overlap here in two possible ways. As the JAC sees this case, the NIGC has undertaken a major federal action by approving or allowing the Tribe's casino construction project, and NEPA requires the NIGC to prepare or update an EIS. *See* Pls.' Mem. P.&.A. (Mem.) 6, ECF No. 60-1. From the defendants' point of view, the NIGC has not yet undertaken any major federal action, although it will if the Commissioner approves the Tribe's gaming management contract, and only then will it be required to prepare or update an EIS. Tribe Defs.' Opp'n 6–7; Fed. Defs.' Opp'n 13–15.

C.   Factual Background

In April 2002 the BIA published a notice of its intent (NOI) to study the environmental impacts of the Tribe's proposed casino. Notice of Intent to Prepare EIS, 67 Fed. Reg. 15,582 (Apr. 2, 2002).[5] In administrative law argot, the BIA announced its intent to prepare

---

[5] The court grants the JAC's unopposed request to take judicial notice of three entries in the Federal Register. Pls.' Req. J. Not. (RJN), Exs. A–C, ECF No. 60-2. These entries are a matter of public record and "capable of accurate and ready determination by resort to sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b).

The court denies the JAC's request in all other respects. The court is unable to verify the

an EIS of a proposed fee-to-trust transfer of 101 acres near Jamul, California. *Id.* It would

cooperate with the NIGC. *Id.* The Tribe planned to construct a casino and hotel on land already

held in trust and use 101 acres of new trust land for parking and other support facilities. *Id.* The

agencies' EIS would weigh a variety of environmental concerns: "traffic, threatened and

endangered species, wildlife habitat and conservation areas, wastewater disposal, air quality, and

socio-economic impacts." *Id.* The BIA gave instructions for the submission of written

comments. *Id.*

Several months later, in January 2003, the BIA published a second notice, this

time announcing it would soon file a draft EIS on the proposed casino project. Notice, 68 Fed.

Reg. 1,475 (Jan. 10, 2003). The draft EIS recommended approval of the fee-to-trust transfer, the

casino, support facilities, and a contract for a third party to manage gaming in the casino. *Id.* The

notice described several alternatives to the casino project, including swapping the hotel or casino

for retail development, constructing the hotel and casino in a different location, and abandoning

the project altogether. *Id.* Comments on the draft EIS were made available to the public. *Id.*

Between 2003 and 2006, the Tribe revised its plan. Notice of Intent to Prepare

SEIS, 78 Fed. Reg. 21,398 (Apr. 10, 2013). Rather than build the casino's support facilities on

new trust land, the Tribe decided to use existing reservation land for both the casino and its

support facilities. *Id.* An access road over the Tribe's land would connect the casino to an

adjacent highway. *Id.* To address the environmental impacts of its revised plan, the Tribe

prepared its own environmental statement and solicited and addressed public comments. *Id.*

After completing this evaluation, the Tribe requested the NIGC's approval of a contract between

itself and SDGV, a subsidiary of Penn National. *Id.* This contract would allow SDGV to manage

gaming in the casino on the Tribe's behalf. *Id.* Because the Tribe's plan had changed, although it

still included a gaming management contract, and years had passed since the old EIS was

accuracy of the letter from San Diego County, RJN Ex. D, or the news article, RJN Ex. E, and the
JAC makes no effort to assist the court on this front. The court also notes that even were it to
take notice of these documents, the JAC's citations to them are for purposes not relevant to the
court's decision.

1   circulated, the NIGC determined it would develop and issue a supplemental EIS (SEIS), and it

2   announced this intent in the Federal Register in April 2013.  *Id.*  As described in the April 2013

3   NOI, the SEIS's scope was even broader than the EIS's: it would address "land resources, water

4   resources, air quality, biological resources, cultural and paleontological resources,

5   socioeconomics, transportation, land use, agriculture, public services, noise, hazardous materials

6   and visual resources."  *Id.*  "[G]iven the long history of the project and the extensive public input

7   received to-date," the NIGC decided not hold a public hearing on the SEIS's scope, but it invited

8   written comments both in response to the SEIS's scope and in general.  *Id.*

9            The JAC filed this action on September 15, 2013.  Compl., ECF No. 1.  In

10  February 2014 the JAC amended its complaint and included allegations the Tribe had begun

11  construction.  First Am. Compl. ¶¶ 7, 8, 88, ECF No. 15.  The court dismissed the First Amended

12  Complaint in August 2014, because the Tribe had not been joined as a required party, among

13  other reasons.  Order Aug. 5, 2014, at 27, ECF No. 50.  The JAC amended its complaint again,

14  Second Am. Compl., ECF No. 51, and on January 2, 2015, it filed this motion, Pls.' Mot. Prelim.

15  Inj., ECF No. 60, evidently precipitated by the Tribe's announcement it had finished excavating

16  the casino's foundation, Mem. 5.

17           The court takes judicial notice that as of the date of this order, the NIGC has not

18  published a notice in the Federal Register[6] that it has completed its review of the Tribe's gaming

19  management contract or that the NIGC Chairman has approved or disapproved it.  *See also*

20  Thomas Decl. ¶¶ 15–20, ECF No. 63-3 (as of January 16, 2015, the NICG had not completed its

21  review, and the Chairman had not approved or disapproved the contract).  Neither have the parties

22  alerted the court to any changes in the status of the NIGC's or the Chairman's review.

23

24  _____

25  [6]  By statute, the court may take judicial notice of the contents of the Federal Register.  44 U.S.C.
    § 1507 ("The contents of the Federal Register shall be judicially noticed and without prejudice to

26  any other mode of citation . . . ."); *accord Friends of Amador Cnty. v. Salazar*, 554 F. App'x 562,
    565 (9th Cir.), *cert. denied sub nom. Friends of Amador Cnty. v. Jewell*, __ U.S. __, 135 S. Ct.

27  717 (2014).

28

                                                8

II.     DISCUSSION

         A.     Administrative Procedure Act Section 706(1)

         The JAC seeks a "writ of mandate."  Mem. 10.  In support of its motion it cites

section 706(1) of the Administrative Procedure Act (APA), 5 U.S.C. § 706(1), and *North County*

*Community Alliance, Inc. v. Salazar*, 573 F.3d 738, 744 (9th Cir. 2009), a case brought under 5

U.S.C. § 706(1).  But the JAC relies on *Johnson v. Reilly*, 349 F.3d 1149, 1154 (9th Cir. 2003), to

define the standard it says the court should apply to its motion.  *Johnson* describes the standard

applicable to the Mandamus and Venue Act of 1962, 28 U.S.C. § 1361, not § 706 of the APA.

349 F.3d at 1153.  The two statutes are similar, but the JAC's motion is best understood as one to

compel agency action unlawfully withheld, based on a § 706(1) claim, and the court construes it

as such.  *See Independence Min. Co. v. Babbitt*, 105 F.3d 502, 507 (9th Cir. 1997) ("Although the

exact interplay between these two statutory schemes has not been thoroughly examined by the

courts, the Supreme Court has construed a claim seeking mandamus under [§ 1361], 'in essence,'

as one for relief under § 706 of the APA." (quoting *Japan Whaling Ass'n v. American Cetacean*

*Soc'y*, 478 U.S. 221, 230 n.4 (1986))).

         The APA grants judicial relief to a person "suffering legal wrong because of

agency action."  5 U.S.C. § 702.  It empowers a federal district court to "compel agency action

unlawfully withheld or unreasonably delayed."  *Id.* § 706(1).  "[A] claim under § 706(1) can

proceed only where a plaintiff asserts that an agency failed to take a *discrete* agency action that it

is *required to take*."  *Norton v. S. Utah Wilderness Alliance*, 542 U.S. 55, 64 (2004) (emphasis in

original).  The agency action sought under section 706(1) must be "legally *required*."  *Id.* at 63

(emphasis in original).  An agency's ministerial duties are "required," but not its discretionary

decisions.  *Id.* at 64.

         Here, because NEPA's implementing regulations define "major federal action" to

include an agency's "[a]pproval of specific projects, such as construction or management

activities located in a defined geographic area," 40 C.F.R. § 1508.18(b)(4), the court finds that the

NIGC will undertake a major federal action for purposes of NEPA if it approves the Tribe's

9

1    proposed gaming management contract.[7]  The federal defendants appear to agree.  *See* Thomas

2    Decl. ¶ 10, ECF No. 63-3.  The same cannot be said of the NIGC's alleged approval of the

3    casino's construction.  The court is aware of no statute or regulation, and the parties have cited

4    none, that would require the NIGC or BIA to review or approve a management contract before

5    the subject casino is constructed or operated, or to approve construction at all.  To the contrary,

6    the IGRA implies the Tribe may construct and operate a casino on its own land without a

7    management contract.  *See* 25 U.S.C. § 2710(d)(9) ("An Indian tribe *may* enter into a

8    management contract . . . ." (emphasis added)).  And as noted above, a tribe's compact, not

9    federal regulation, governs its Class III gaming activities within a casino.  *Colorado River Indian*

10   *Tribes*, 466 F.3d at 137–40.  The JAC has not shown the NIGC has authority to "approve" the

11   casino's construction, and the NIGC undertakes no major federal action by standing aside as

12   construction progresses on the Tribe's land.

13          The JAC's position rests on equivocation of the 2013 management contract and

14   the 2003 fee-to-trust proposal.  The Tribe abandoned the earlier proposal and seeks now only the

15   NIGC's approval of its management contract.  As described above, the federal defendants have

16   not approved construction of the casino, and the IGRA provides no statutory basis for the federal

17   defendants to do so.  The court cannot rely on the JAC's unsupported general assertions that

18   "[t]he federal role in this casino project is pervasive and comprehensive," "[t]he NIGC regulates

19   gaming by the [Tribe]" and "the NIGC's approval of the [management contract] is not a minor

20   matter."  Reply 10–11.  Neither do the JAC's citations support its position.  *See, e.g., id.* at 10

21   (citing *Save Barton Creek Ass'n v. Fed. Highway Admin. (FHWA)*, 950 F.2d 1129, 1135 (5th Cir.

22   1992) ("[T]he federal agency must possess actual power to control the nonfederal activity."

23   (internal citations and quotation marks omitted)) and *Nat'l Ass'n for Advancement of Colored*

24

25          [7] Finding the NEPA applies is the first step in the required analysis.  To succeed, a second
step is required: the JAC must also show the NIGC's duty to prepare an SEIS is discrete and
26   legally required.  *Wilderness Alliance*, 542 U.S. at 64.  But because the federal defendants have
not undertaken a major federal action to approve construction of the casino, the court does not
27   reach this second step.

28

1    *People v. Med. Ctr., Inc.*, 584 F.2d 619, 629 (3d Cir. 1978) (an agency may have taken an action

2    by permitting another party to act)).

3            The JAC takes a different tack in its reply, contending instead that the court must

4    compel the NIGC and BIA to complete the SEIS quickly.  Reply 6–8.  While the court typically

5    does not consider new arguments in reply, *see State of Nev. v. Watkins*, 914 F.2d 1545, 1560 (9th

6    Cir. 1990), it addresses this argument briefly because there is no prejudice to defendants in doing

7    so.  The JAC protests the deliberate pace of the NIGC's review, noting the management contract

8    and an accompanying gaming ordinance were submitted to the NIGC and BIA in mid-2013.

9    Reply 7.  Again the JAC cites no statute or regulation and relies instead on the general principal

10   forbidding an agency from justifying completed projects by *post hoc* environmental review.  *Id.* at

11   6–7.  No project has been completed here, and the federal action at issue is the NIGC's approval

12   of the management contract, not its power to halt casino construction.  The NIGC has not

13   completed its review, and the Tribe has not begun operating its casino, so any adverse

14   environmental impacts of its operation remain at most speculative.  The JAC has not shown the

15   NIGC will approve the contract without conducting the review required by NEPA, and cannot

16   succeed by seeking speedier or otherwise better management in general.  *See Wilderness Alliance*,

17   542 U.S. at 64 ("[R]espondent cannot seek wholesale improvement of [an agency] program by

18   court decree . . . ." (citation, internal quotation marks, and emphasis omitted)).  Neither does the

19   JAC have the power to enforce IGRA's deadlines for the NIGC's review.  *See* 25 U.S.C. §

20   2711(d) ("The Indian tribe," not a third party, "may bring an action in a United States district

21   court to compel action by the Chairman if a contract has not been approved or disapproved within

22   the period required by this subsection.").

23           The JAC's reply brief includes several additional arguments absent from its

24   original motion.  *See* Reply 4 (approval of the Tribe's gaming ordinance is a final agency action

25   subject to this court's review); *id.* at 4–5 (the land on which the casino will be built was

26   improperly determined to be the Tribe's reservation); *id.* at 7 (the management contract

27   improperly or incompletely describes certain "adjacent property"); *id.* at 11 (casino construction

28   must stop because the Tribe has breached its state compact).

1    The court addresses only the first of these arguments, construing it as a contention

2  that the NIGC undertakes a major federal action when it approves a gaming ordinance.[8]  The

3  NIGC would then be required to comply with NEPA.  The Ninth Circuit appears to have

4  dismissed this argument summarily in *Cnty. Cmty. Alliance, Inc. v. Salazar*, 573 F.3d 738 (9th

5  Cir. 2009).  In *Salazar*, the plaintiffs argued (1) the NIGC's failure to make an "Indian lands"

6  determination before approving a gaming ordinance violated the IGRA; and (2) the NIGC

7  violated NEPA by failing to prepare an EIS in connection with the casino's construction.  *Id.* at

8  740.  The Ninth Circuit resolved the case in favor of the government on both claims.  It addressed

9  the NEPA claims in one short paragraph:

10       The Alliance claims that NIGC's failure to make an Indian lands
         determination constituted a "major Federal action[ ]" under 42
11       U.S.C. § 4332(C) requiring environmental review, including
         preparation of an EIS, under NEPA.  We disagree.  There has been
12       no major federal action in this case.  Therefore, the Appellees had
         no obligation under NEPA.

13

14  *Id.* at 749 (alterations in original).  The broad statement "[t]here has been no major federal action

15  in this case" appears to apply to the NIGC's "failure to make an Indian lands determination."  But

16  if approval of the gaming ordinance alone was a major federal action, the Ninth Circuit could not

17  have concluded as it did.  In other words, if approval of the ordinance without a concurrent lands

18  determination was not a major federal action, then the decision to approve the ordinance by

19  definition could not have been a major federal action either.  This reading is bolstered by Judge

20  Gould's dissent to the *Salazar* majority opinion because he believed the NIGC was required to

21  make the lands determination, even as he concurred in the majority's NEPA analysis.  *Id.* at 749

22  (Gould, J., dissenting).

23       The JAC's motion for a writ of mandate is denied.

24

25

26

[8] The defendants have objected to evidence submitted with the JAC's reply.  *See* Tribe Defs.'
27  Objs., ECF No. 72; Federal Defs.' Notice, ECF No. 73; Pls.' Response, ECF No. 74.  That
    evidence is not relevant to the analysis here, and the court does not consider it.
28

1      B.      Preliminary Injunction

2              1.      Standing

3              As an initial matter, the court concludes on its own motion that it lacks subject

4   matter jurisdiction to hear the JAC's request for a preliminary injunction against the federal

5   defendants and against defendants Hunter, Chamberlain, Mesa, Tellow and Lotta.  District courts

6   have "both the power and the duty" to raise the adequacy of a plaintiff's standing *sua sponte*.

7   *Bernhardt v. Cnty. of L.A.*, 279 F.3d 862, 868 (9th Cir. 2002).  Article III standing requires that a

8   plaintiff allege injury "likely to be redressed by a favorable judicial decision." *Lexmark Int'l, Inc.*

9   *v. Static Control Components, Inc.*, ___ U.S. ___, 134 S. Ct. 1377, 1386 (2014).  Because the

10  JAC invokes this court's jurisdiction, it bears the burden to show its standing.  *Lujan v. Defenders*

11  *of Wildlife*, 504 U.S. 555, 561 (1992).  The elements of standing "are not mere pleading

12  requirements but rather an indispensable part of the plaintiff's case."  *Id.*  Here, in the early stages

13  of litigation, the JAC's "general factual allegations . . . may suffice," even if unsupported by

14  evidence.  *See id.*

15             An order enjoining the federal defendants from constructing the casino, if the court

16  could issue it, would not redress the JAC's alleged injuries because the federal defendants would

17  have no power to comply.  The court concluded in its prior order that the Jamul Indian Village is

18  a federally recognized tribe.  As such it exercises "inherent sovereign authority."  *Okla. Tax*

19  *Comm'n v. Citizen Band Potawatomi Tribe of Okla.*, 498 U.S. 505, 509 (1991).  "[U]nless and

20  'until Congress acts, the tribes retain' their historic sovereign authority."  *Bay Mills*, 134 S. Ct. at

21  2030 (quoting *United States v. Wheeler*, 435 U.S. 313, 323 (1978)).  The JAC's allegations do not

22  identify any law abrogating the Tribe's authority to construct the casino.  As noted above, the

23  IGRA empowers the NIGC to approve its budget, collect civil fines, establish fee rates, make

24  permanent a temporary order closing a gaming facility,[9] monitor Class II gaming, inspect Class II

25          [9] The NIGC's authority to close a gaming facility derives from its authority to enforce
26  tribal gaming orders and other provisions of the IGRA.  *See* 25 U.S.C. § 2713(b)(1) (power to
    close); *id.* § 2710(b)(2)(E) (authorizing the Chairman to approve tribal ordinances which provide
27  that "construction and maintenance of the gaming facility, and the operation of that gaming is
    conducted in a manner which adequately protects the environment and the public health and
28  safety"); *United States v. Seminole Nation of Okla.*, 321 F.3d 939, 945 (10th Cir. 2002) (defining

1   gaming premises, conduct background investigations, inspect records, use the U.S. mail, procure

2   supplies, enter contracts with public and private entities, hold hearings, administer oaths, and

3   promulgate implementing regulations — not to arrest private casino construction projects on

4   reservation land before any gaming activities have taken place.  25 U.S.C. § 2706.  The JAC has

5   not alleged or shown the IGRA empowers the NIGC Chairman to stop such a project here.  *See*

6   *id.* § 2705(a).

7           Similarly, an order enjoining defendants Hunter, Chamberlain, Mesa, Tellow and

8   Lotta from constructing the casino could not redress the JAC's alleged injuries.  Only Indian

9   tribes have the right to regulate gaming activities on Indian lands.  *See* 25 U.S.C. § 2701(5).  If

10  sued in their representative capacity, Hunter, Chamberlain, Mesa, Tellow and Lotta are protected

11  by the Tribe's sovereign immunity.  *See Miller v. Wright*, 705 F.3d 919, 927–28 (9th Cir. 2012);

12  *Allen v. Smith*, No. 12-1668, 2013 WL 950735, at *13 (S.D. Cal. Mar. 11, 2013), *aff'd*,

13  597 F.App'x 442 (9th Cir. 2015).  In their individual capacities, they have no right to regulate the

14  Tribe's gaming activities; the court made the same determination as to defendant Hunter in its

15  previous order.  *See* Order Aug. 5, 2015, at 19–20, ECF No. 50.

16          The JAC's motion is denied as to the federal defendants and defendants Hunter,

17  Chamberlain, Mesa, Tellow and Lotta.[10]

18                  2.      Penn National, San Diego Gaming Village, and C.W. Driver

19          Standing does not impede the motion against the three corporate defendants.  "A

20  preliminary injunction is an extraordinary remedy never awarded as of right," *Winter v. Natural*

21  *Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008), and "should not be granted unless the movant, *by a*

22  *clear showing*, carries the burden of persuasion," *Lopez v. Brewer*, 680 F.3d 1068, 1072 (9th Cir.

23  2012) (quoting *Mazurek v. Armstrong*, 520 U.S. 968, 972 (1997) (per curiam)) (emphasis in

---

24  the power to close gaming facilities).  The JAC's briefing omits any argument that the Tribe has
25  violated its gaming ordinance or the IGRA and does not show the JAC has standing to pursue
    closure on behalf of the NIGC of the Chairman.

26  [10]  Even if the JAC had standing to assert these claims, it appears the analysis below would apply
27  equally to the claims against the federal defendants and defendants Hunter, Chamberlain, Mesa,
    and Tellow and would compel resolution in the defendants' favor.
28

14

1    original).  The purpose of a preliminary injunction is to preserve the status quo and the rights of

2    the parties until a final judgment can be issued. *U.S. Philips Corp. v. KBC Bank N.V.*, 590 F.3d

3    1091, 1094 (9th Cir. 2010).  "A plaintiff seeking a preliminary injunction must establish [1] that

4    he is likely to succeed on the merits, [2] that he is likely to suffer irreparable harm in the absence

5    of preliminary relief, [3] that the balance of equities tips in his favor, and [4] that an injunction is

6    in the public interest." *Winter*, 555 U.S. at 20.

7              The Ninth Circuit has "also articulated an alternate formulation of the *Winter* test."

8    *Farris v. Seabrook*, 677 F.3d 858, 864 (9th Cir. 2012). That formulation is referred to as the

9    "serious questions" or the "sliding scale" approach.  "[S]erious questions going to the merits" and

10   a balance of hardships that tips sharply towards the plaintiff can support issuance of a preliminary

11   injunction, so long as the plaintiff also shows that there is a likelihood of irreparable injury and

12   that the injunction is in the public interest." *Alliance for the Wild Rockies v. Cottrell*, 632 F.3d

13   1127, 1135 (9th Cir. 2011); *see also id.* at 1132 ("[T]he 'serious questions' approach survives

14   *Winter* when applied as part of the four-element *Winter* test.").  Under the "serious questions"

15   approach to a preliminary injunction, "[t]he elements of the preliminary injunction test must be

16   balanced, so that a stronger showing of one element may offset a weaker showing of another."

17   *Lopez*, 680 F.3d at 1072. Irrespective of its approach, a court must balance the competing alleged

18   harms while considering the effects on the parties of the granting or withholding of the injunctive

19   relief. *Winter*, 555 U.S. at 24.  In exercising that discretion, a court must also consider the public

20   consequences of the extraordinary remedy.  *Id.*

21             The court may rely on declarations, affidavits, and exhibits, among other things.

22   *Johnson v. Couturier*, 572 F.3d 1067, 1083 (9th Cir. 2009).  Such evidence need not conform to

23   the standards for a summary judgment motion.  *Bracco v. Lackner*, 462 F. Supp. 436, 442 n.3

24   (N.D. Cal. 1978); *see also Flynt Distrib. Co. v. Harvey*, 734 F.2d 1389, 1394 (9th Cir. 1984)

25   ("The trial court may give even inadmissible evidence some weight, when to do so serves the

26   purpose of preventing irreparable harm before trial."); *Oakland Tribune, Inc. v. Chronicle Pub.*

27   *Co., Inc.*, 762 F.2d 1374, 1377 (9th Cir. 1985) (in ruling on a motion for preliminary injunction,

28   the "weight to be given each [affiant's] statement is in the discretion of the trial court").

a)      <u>Likely Success on the Merits</u>

The JAC seeks an order enjoining the construction of the casino until the environmental review required by NEPA is complete.  Mem. 10.  Its motion for a preliminary injunction appears to be based on its APA claim, and the memorandum in support of its motion omits mention of any alternative cause of action.  *See* Mem. 8 ("[A]s is outlined above, Plaintiffs are likely to succeed on the merits of their NEPA claim that the draft SEIS should be finalized and circulated before the continued construction of the casino has an adverse environmental impact or limits the choice of reasonable alternatives and mitigation measures.").  Should the JAC instead rely on its claim that the casino will be built on land that is not the Tribe's land, the court's previous order would control here and prevent its success.  *See* Order Aug. 5, 2014, 26–27, ECF No. 50 (dismissing the complaint for failure to join the Tribe, a required party).

As noted above, the SEIS is meant to study the impacts of the proposed gaming management contract, not construction of the casino.  The JAC has submitted no evidence to show the BIA or NIGC have already approved the gaming management contract or that the BIA or NIGC will approve the contract before completion of the SEIS and all other analysis required by NEPA.  Even were the court to enjoin approval of the management contract, construction could continue.  *See* 25 U.S.C. § 2710(d)(9); Order Aug. 5, 2014, at 22, ECF No. 50; Thomas Decl. ¶ 23, ECF No. 63-3.  Finally, although the SEIS may include an evaluation of environmental factors that would also be relevant to the construction of a casino, as described above, the JAC has not shown any federal agency has any duty to complete NEPA reviews of a private construction project on the Tribe's reservation.  The JAC has shown neither its likely success on the merits nor serious questions going to the merits of its claims.

b)      <u>Irreparable Harm</u>

A litigant who seeks a preliminary injunction must show not only that it will suffer irreparable harm, but that this harm will accrue "in the absence of preliminary relief."  *Winter*, 555 U.S. at 20.  *See also Rodriguez ex rel. Rodriguez v. DeBuono*, 175 F.3d 227, 235 (2d Cir. 1999) ("[T]he harm must be so imminent as to be irreparable if a court waits until the end of trial . . . .").  If the harm identified will be redressed in the ordinary course of litigation, then a

16

1    preliminary injunction affords more relief than required and should not be granted.  For this

2    reason the immediacy of the harm identified is relevant to any request for a preliminary

3    injunction, and the JAC does itself no favors by bringing this motion almost a year after learning

4    construction of the casino had begun.  *Arc of California v. Douglas*, 757 F.3d 975, 990 (9th Cir.

5    2014) ("[A] plaintiff's failure to seek judicial protection can imply the lack of need for speedy

6    action." (citations and internal quotation marks omitted)).  Nevertheless, courts are generally

7    "loath to withhold relief" on the basis of delay alone.  *Id.* (quoting *Lydo Enters., Inc. v. City of*

8    *Las Vegas*, 745 F.2d 1211, 1214 (9th Cir. 1984)).

9            The JAC has identified two sources of irreparable harm: no public comment period

10   has occurred, and environmental impacts have not been mitigated.  It has not provided evidence

11   that the BIA and NIGC have not and will not solicit and address public comments or mitigate the

12   environmental impacts of the management contract.  The evidence before the court supports the

13   opposite conclusion.  The 2013 NOI invited written comments on both the scope of the SEIS and

14   the implementation of the proposed gaming management contract.  Notice of Intent to Prepare

15   SEIS, 78 Fed. Reg. 21,398 (Apr. 10, 2013).  Once the draft SEIS is complete, the BIA will

16   publish a notice of availability in the Federal Register inviting comments.  Rydzik Decl. ¶ 12,

17   ECF No. 63-1.  The public may then submit comments during a forty-five-day period and

18   participate in a public meeting.  *Id.*  When the comment period ends, the BIA will review the

19   comments it has received and make appropriate revisions to the SEIS.  *Id.*

20                        c)     <u>Balance of the Equities</u>

21           A district court must balance each party's position against the other's and weigh

22   the "effect on each party of the granting or withholding of the requested relief."  *Winter*, 555 U.S.

23   at 24 (quoting *Amoco Production Co. v. Gambell*, 480 U.S. 531, 542 (1987)).  Were the court to

24   deny the JAC's motion, the JAC would be required to wait for release of the SEIS, submit

25   comments at a later date, and the construction of the casino would continue.  The Tribe could not

26   operate the casino through a third party gaming management contract until that contract's

27   environmental impacts were fully studied and mitigated.  Were the court to grant the motion, the

28   defendants would be enjoined from constructing the casino while the BIA and NIGC complete an

17

1    environmental review of the contract under which it will be operated, even though the Tribe could

2    not operate the incomplete casino.  Such an order would force the tribally affiliated defendants to

3    incur substantial costs.  *See* Carroll Decl. ¶ 4, ECF No. 62-1.  On balance, an order denying the

4    motion will not prevent the JAC from enjoying any rights afforded by the IGRA and NEPA and

5    would avoid significant expense to the tribally affiliated defendants.

6                              d)      The Public Interest

7            The JAC argues only that "it is in the public interest to complete the SEIS process

8    before the casino is constructed."  This argument elides the distinction between the casino

9    construction and management contract and ignores the public interest, as defined by IGRA, to

10   promote tribal economic development and protect gaming as a "means go generating tribal

11   revenue." 25 U.S.C. § 2702.

12           C.      The Court's Standing Order

13           Soon after the JAC filed its original complaint, the court issued a copy of its

14   standing order.  Standing Order, ECF No. 6-1.  The standing order requires represented parties to

15   meet and confer before filing motions.  *Id.* at 3.  It also limits replies to ten pages and allows

16   exceptions only in "rare instances . . . for good cause shown" upon timely application.  *Id.* at 4.

17   The defendants informed the court that the JAC had not met or conferred with them before filing

18   its motion.  Tribe Defs.' Opp'n 15.  The JAC did not dispute this assertion.  The JAC's reply brief

19   also numbers thirteen pages, including nearly five devoted to an introduction and "statement of

20   the case," which largely repeat arguments made in its original motion.  Reply 1–5.  The JAC

21   applied for no exception and made no showing of good cause.

22           This court's responsibility includes a duty to ensure its limited resources are

23   allocated effectively.  *Martin v. District of Columbia Court of Appeals*, 506 U.S. 1, 3 (1992) (per

24   curiam).  The standing order has the effect its name indicates: it is the court's order and does not

25   diminish in effect over time.  Its requirements are derived from experience and are imposed in an

26   effort to secure the just, efficient, and economical resolution of every case.  When parties and

27   their counsel overlook the standing order, they also overlook opportunities to narrow disputes,

28   avoid unnecessary costs, and save time.  The JAC is cautioned that future failures to follow this

1  court's standing order may result in sanctions, including the striking of excess pages and motions

2  filed without the benefit of prior consultation with the opposing party.

3  III.      CONCLUSION

4          The motion is DENIED.

5          IT IS SO ORDERED.

6  DATED:  May 15, 2015.

7

8  _____

9  UNITED STATES DISTRICT JUDGE

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28